## HIPPODROME BLDG. CO. v. IRVING TRUST CO.

### In re RADIO-KEITH-ORPHEUM CORPORATION.

### No. 428.

Circuit Court of Appeals, Second Circuit.
July 6, 1937.

754

Morley, Stickle & Kelley, of Cleveland, Ohio, and Dick & Burroughs, of New York City (John E. Morley, of Cleveland, Ohio, and Alexander C. Dick and Herbert Allan Jacob, both of New York City, of counsel), for appellant.

William J. Donovan, of New York City (David Teitelbaum and Theodore S. Hope, Jr., both of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from an order in reorganization under section 77B, Bankr.Act (11 U.S.C.A. § 207), liquidating the claim of a lessor upon the guaranty by the debtor of a lease. The facts are as follows: The claimant, the Hippodrome Building Company of Cleveland, let a theatre in that city to a subsidiary of the debtor, the Cleveland Hippodrome Theatre Company, for seventeen years at a rental of $150,000. per annum. The debtor guaranteed the payment of the rent reserved, and all the lessee's covenants. The lessee entered and paid the rent until March 1, 1933, when it defaulted; on March 31, 1933, it was adjudicated a bankrupt; and on April 15th its trustee rejected the lease and abandoned the premises. Meanwhile, on January 27, 1933, a sequestration suit had been filed against the debtor and a receiver appointed, who continued to manage the property until June 8, 1934, when this petition for reorganization was filed and approved and a trustee appointed.

The lease provided that if the lessee should default in the rent or in the performance of any covenant, and the default should continue for twenty days, the lessor should be free either to reënter the premises and terminate the lease, or "without terminating said lease or the obligations of the lessee hereunder, to let, sublet, and relet the premises from time to time for and during the unexpired period of the term * * * and to receive and collect the rents and income from said premises, and to apply same on account of sums due to the lessor hereunder at the time of such entry and which may become due under the terms of this lease." The lessor took advantage of the second alternative and relet the premises on April 27, 1933, expressly declaring that it did not terminate the lease. This reletting was on a weekly basis and the lessor got nothing from it; it proved so unsatisfactory that it was abandoned, and the lessor looked elsewhere. Finding it impossible to let the theatre upon a cash basis at all, on November 4, 1933, it leased it to the General Theatre Company for ten years, agreeing to take as rent, not a fixed sum, but one to be calculated as follows: The General Theatre Company had rented another theatre in Cleveland, the Lake Theatre, which it wished also to operate, and the lessor's lease of the Hippodrome Theatre to it provided that the net profits from both theatres should be pooled, and that the rent for the Hippodrome Theatre should be 65 per cent. of the whole, both parties reserving the right to cancel at any time on six months' notice, if the rent for any year fell below $90,000. The case was tried on stipulation, which among other matters declared that qualified witnesses, if called, would swear that the fair rental value of the premises on April 15, 1933, and at the trial, was not more than $90,000, and that the amount of loss of future rents to the lessor was not less than $700,000.

The issues were referred to a master, who found that the lessor had a claim of $88,666.39 against the debtor, limited to the rent up to November 4, 1933, the date of the second lease. He refused to grant anything more because he concluded that when the lessor allowed the earnings of the Lake Theatre to be pooled with those of the Hippodrome Theatre, it imposed a risk upon the debtor which as guarantor it had not accepted. Had it not been for this, he would have granted the claim at least up to September 28, 1934, the date fixed by the court

as the last day to file claims. This report the judge confirmed. There are two points at issue: First, whether the claim is valid at all under section 77B; and, if so, whether the damages should go beyond November 4, 1933.

 Subdivision (b) (10) of section 77B (11 U.S.C.A. § 207(b) (10) defines as creditors in reorganization "all holders of claims of whatever character * * * including claims under executory contracts, whether or not such claims would otherwise constitute provable claims under this Act [title]." Nothing could be more comprehensive and nothing less would serve, because unless all claims can be brought within the plan, preferences will result; if the excluded claim is discharged, the rest are preferred; if it is not, it is preferred. When the petition was filed on June 8, 1934, the lessee had been bankrupt and its trustee had repudiated the lease for over a year; the debtor stood charged as guarantor for the payment of every rental as it fell due month by month; the lessee was not discharged of these, and its discharge would not have affected the guaranty anyway. The lessor had not terminated the lease; it did indeed reënter and relet, but under the provisions we have quoted, which preserved the lease. There is no legal objection to such a stipulation; how far it differs from the common covenant which allows the lessor to reënter and forfeit the term, but also to relet for the lessee's account, we need not inquire. The important thing is that the successive installments of rent were not released; and that the lessor was acting only to keep down its damages. The claim was too uncertain for proof against the lessee's trustee. Manhattan Properties v. Irving Trust Co., 291 U.S. 320, 54 S.Ct. 385, 78 L.Ed. 824. But it was exactly to provide for claims uncertain in amount and even in obligation that the language quoted from subdivision (b) (10), section 77B, was chosen. City Bank Farmers Trust Co. v. Irving Trust Co., 299 U.S. 433, 57 S.Ct. 292, 81 L.Ed. 324. The claim, however contingent, is to be liquidated by the best means at hand, deducting from the discounted rents the discounted presumptive receipts. It is of no moment that the claim at bar is not upon the lease itself; it needs no recourse to the language in subdivision (b) (10) respecting the "rejection" of an executory contract. Regardless of whether a guaranty can be such a contract, the obligation was absolute at petition filed; the only question is, and the only question can be, how it shall be liquidated.

 The argument which the master and the judge accepted was that pooling the receipts of the two theatres exposed the debtor to an undue risk, and was a breach of the lessor's duty to keep down his loss. That question is one of fact; the only principle of law involved is that the promisee must do the best he can. The lessor first let the theatre in the usual way; that was a failure. If it had stopped there, it would have had to show that all further efforts would have been fruitless; but if it could have done that, it would have charged the debtor with the full yearly rental of $150,000 for the balance of the term. However, it could not have safely refused to relet for a rent consisting, for example, of a percentage of the sublessee's profits, although these could not have been forecast. Whatever was best to keep down the loss, it was bound to do. We can see no difference, when that is the stake, between a lease based upon the earnings of the Hippodrome Theatre, and one based upon a pool of the two theatres. If the choice was either a pool of the two, or no lease at all, the pool at least offered a chance of salvage and imposed no added loss on the debtor, for the rents were fixed; the only question was the credits it should be allowed. Especially was this true in the light of the provision giving the lessor the right to cancel. It is true that the stipulation does not state as clearly as we should like that the lease to the General Theatre Company was the best to be had; still, we think that it will serve, provisionally at any rate. It says that the lessor's manager would swear, if called, that he had made "diligent efforts * * * to procure a responsible tenant * * * for a definite cash rental, but without success," and that the sublease was made "with the view of obtaining * * * the greatest revenue possible for the trustee." Taken literally there is here a hiatus; the language is clear that no cash rental could be got, but it is not so clear that the lease taken was the best that could be got with reasonable effort. Yet to throw out the claim on so verbal a basis would, we think, contradict the intent of the stipulation, and indeed the parties have not so argued the case; the discussion has been as to the inherent impropriety of such a lease as a measure of the debtor's credits. Nevertheless, if the

trustee wishes, it may put the lessor to its proof that it was the best salvage it could get.

■ There still remains the difficulty that the future receipts cannot be appraised; indeed, they could not have been if they were measured on the earnings of the Hippodrome Theatre alone. All we know is that up to the time of the trial the lessor had recovered nothing. We are to remember, however, that in any case the claim will be discharged; and, that if we cannot appraise the credits in some way, we must either allow the undiminished discounted rentals, or we must expunge the whole claim; no half measures are possible, and either extreme is grossly unjust. Forced to such an alternative, we should make the best appraisal we can; the only one available is the reasonable renting value of $90,000. It is of course possible that this may turn out to be too little; 65 per cent. of the pool may be more. But there is always a chance in such appraisals even when the lessor sublets at a fixed rent for the balance of the term. Moreover, it is just because of such inevitable uncertainties that the risk is reduced by the limit set upon such claims which we shall discuss in a moment, and which in this case is $450,000. The lessor's discounted loss, had the premises not been rented at all, was over $1,600,000; and the debtor is therefore really getting a yearly credit, not of $90,000, but of more nearly $120,000. The risk that the returns on the theatre should have averaged as much as this are as little as the circumstances allow.

■ The last question is of the three years' limit imposed by subdivision (b) (10) upon claims for "injuries" resulting from the "rejection" of leases. This is not such a claim of course, and the letter of the statute does not apply to it; yet it seems to us incredible that it should not go so far, and that the claim should be good for the full seventeen years during which the lease will run. If so, a guarantor in reörganization is liable for more than his principal; that cannot be the meaning of the statute; the guaranty is a secondary obligation and must be subject to the same limitations as the primary. We hold therefore that the damages are to be liquidated by subtracting from the present discounted rents to the end of the term, the present discounted value of the term, $90,000, provided, if the trustee wishes, that the lessor must show that no better bargain than the pooling agreement was open to it. The claim will thereafter be composed of any sum due the lessor for rent in default on April 27, 1933, the day when the lessee's trustee "rejected" the lease, plus the damages computed as aforesaid, which are to be limited by three years' gross rents, $450,000.

Order reversed; cause remanded for further proceedings not inconsistent with the foregoing.