**In re DANRIK, LTD., Debtor.**

**Bankruptcy No. 87–05365.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Oct. 19, 1988.

David G. Bisbee, Bisbee, Rickersen & Herzog, Atlanta, Ga., for debtor.

James H. Rollins, Wildman, Harrold, Allen, Dixon & Branch, Atlanta, Ga., for Research Triangle Indus. Park Joint Venture ("RTIP").

## ORDER

JOYCE BIHARY, Bankruptcy Judge.

This case is before the Court on the debtor's objection to a claim by a landlord

on a guaranty of a commercial lease. The debtor argues that the allowable claim is limited by 11 U.S.C. § 502(b)(6). The creditor argues that § 502(b)(6) does not apply to limit a claim against a solvent guarantor, and, alternatively, that if it does apply, that the landlord has suffered actual damages not covered by the limitations set forth in § 502(b)(6). This is a core matter under 28 U.S.C. § 157(b)(2)(B).

The Court held an evidentiary hearing on the debtor's objection on July 13, 1988, and the Court gave the parties time to file briefs in support of their respective positions. The parties also filed a stipulation with regard to various components of the amount claimed.

The pertinent facts are as follows. The debtor Danrik, Ltd. ("Danrik") filed a petition for relief under Chapter 11 of the Bankruptcy Code on July 10, 1987. At the time the case was filed, Danrik operated thirty Domino's Pizza stores in California, Georgia and North Carolina. Three of Danrik's affiliates, DRF, Inc., Duke Pizza, Inc., and Number Twelve, Inc., also filed petitions under Chapter 11, and those debtors operated fourteen Domino's Pizza stores in California, Georgia and North Carolina.[1] The Domino's Pizza stores are operated pursuant to certain franchise agreements the debtors had with Domino's Pizza, Inc. ("DPI"), the franchisor. On April 6, 1988, the Court confirmed the consolidated plan of reorganization for Danrik and the three affiliates. The plan of reorganization provided that the allowed amount of all unsecured claims would be paid in full.

The claimant here is Research Triangle Industrial Park Joint Venture ("RTIP"). On April 9, 1987, RTIP, as lessor, and an entity known as Big Harvest, Inc. ("Big Harvest"), as lessee, entered into a lease ("the Lease"). Dan Shefte, a principal of Danrik, signed the Lease for Big Harvest as its president. The Lease was for 11,991 square feet, which is approximately 10% of a building known as Commercial Park West located in North Carolina. On the same date, Danrik, by its president, Dan Shefte, executed a lease guaranty agreement (the "Guaranty") in favor of RTIP wherein Danrik guaranteed all payments due under the Lease and agreed to pay all expenses and costs including attorney's fees paid or incurred in enforcing the Lease and the Guaranty.

The Lease was for a six year term to commence on June 1, 1987. The payments called for under the Lease include (1) minimum rent of $6.96 per square foot per year plus yearly rent increases tied to the Consumer Price Index ("CPI") with a minimum yearly CPI increase of 3% and a maximum of 6%, and (2) common area maintenance charges which the parties agree total $79,-140.60 for the term of the Lease. On April 16, 1987, the Lease was amended to provide that Big Harvest would receive a credit of twelve months minimum rent.

The premises at issue were to be used by Big Harvest as a commissary for Domino's Pizza Stores, and RTIP was obligated under the Lease to improve the premises to make them suitable for this use. In order to prepare the premises for Big Harvest, RTIP spent $145,310.00. The improvements and work performed were extensive. Among other things, RTIP paid to have the floors tiled, the walls partitioned, the premises designed to accommodate a 35-foot square cooler, and special floor drains installed.

On July 10, 1987, Danrik commenced this Chapter 11 case. RTIP filed a proof of claim in November, 1987, for a sum of not less than $470,000.00 against Danrik, as guarantor of the Lease. On March 21, 1988, Danrik filed an objection to RTIP's proof of claim, arguing that the allowable claim is limited by 11 U.S.C. § 502(b)(6) to one year's rent from the date Danrik filed its Chapter 11 case.

Mr. Ronald Strom, a general partner of RTIP, credibly testified that even after Danrik's Chapter 11 petition was filed, he was not notified that Big Harvest was

---

1. On November 9, 1987, the Court entered an order providing for the joint administration of these four debtors' cases.

abandoning the Lease; that he believed that Danrik's plan of reorganization included plans for the commissary; that Mr. Shefte told him on several occasions that the commissary would be operational; and that Big Harvest did not notify him that it was not going to take possession of the premises until some seven or eight months after Danrik filed its Chapter 11 case. In the early spring of 1988, Mr. Strom was advised that Big Harvest would not be taking possession of the premises and that Danrik's proposed plan of reorganization did not include the commissary, since a condition of the agreement by the franchisor DPI to the terms of the plan was that Danrik and its affiliates would not operate a commissary.

Big Harvest never took possession of the leased premises and never paid any rent under the Lease. Big Harvest itself has never filed a bankruptcy case. Indeed, the record is unclear as to the legal status and purported ownership of Big Harvest. At the hearing on July 13, 1988, Danrik's counsel said that as best he could tell Big Harvest was never actually incorporated, never did any business, and never did anything except sign the Lease. Danrik's counsel also stated that some overlap in the ownership of Big Harvest and Danrik or the other affiliated corporations was intended. There were three alleged individual principals of Danrik, but it was not clear whether one or all of them intended to own Big Harvest. In fact, a dispute among the individuals over the ownership of Danrik and the other three affiliated debtors was one of the problems that led to the filing of Danrik's Chapter 11 petition.

The improvements RTIP made to the premises for Big Harvest were specialized for a Domino's commissary and the premises are unsuitable for another tenant in their present condition. Although Mr. Strom, a general partner of RTIP, testified that RTIP could rent the bare space in an unimproved state for $3.50 per square foot, the cost of removing the improvements in

order to have the space available to rent would be $36,800.00.

The parties do not seem to dispute what the amount of the claim would be if the Court determines that § 502(b)(6) does not apply. Under the terms of the Lease and the laws of the State of North Carolina,[2] RTIP would be entitled to a claim in the amount of $284,704.85 plus reasonable attorney's fees. That claim is calculated as follows:

| | | |
|---|---|---|
| Monthly Minimum Rent for Term of Lease adjusted with minimum 3% CPI increase | | + $526,314.24 |
| Less: | Credit per Letter Agreement | − $ 83,421.00 |
| | | $442,893.24 |
| Plus: | Additional Rent (Common area maintenance expenses) | + $ 79,140.60 |
| | | $522,033.84 |
| Less: | Fair Rental Value of Unimproved Space for Balance of Term | − $289,582.65 |
| | | $232,451.19 |
| Plus: | Cost of Demolition to make Premises Rentable | + $ 36,800.00 |
| | | $269,251.19 |
| Plus: | Releasing Fee | + $ 15,108.66 |
| | | $284,359.85 |
| Plus: | Expenses Incurred in Enforcing Guaranty | + $ 345.00 |
| | | $284,704.85 |

The parties do dispute what the amount of the claim would be if § 502(b)(6) does apply. The debtor claims that the amount could be calculated in one of three ways:

1. 15% of the stated rent for the balance of the term    $62,565.75

OR

2. Rent due for the first year following the date the guarantor Danrik filed its petition (much of which period was during the first year rent-free period)    $ 9,269.00

OR

3. One year's stated rent    $83,421.00

RTIP disputes the applicability of § 502(b)(6), but contends that if § 502(b)(6) applied, the allowable claim would be $100,-909.14 which is the average rent for one year under the Lease.

**2.** The Lease provides that the laws of the state in which the property is located will govern, and the guaranty incorporates the terms of the Lease.

The primary issue in this dispute is whether § 502(b)(6) applies to limit a claim against a debtor who has guaranteed a lease and obtained confirmation of a Chapter 11 plan paying all other unsecured creditors in full.

Section 502 of the Bankruptcy Code generally deals with the allowance of claims or interests, and § 502(b)(6) provides that if an objection to a claim is made, the court shall determine the amount of the claim as of the date of the filing of the petition and shall allow the claim in such amount, *except to the extent that*—

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b)(6).

The language of § 502(b)(6) does not expressly include or exclude from its application claims of a landlord in the Chapter 11 case of a lease guarantor. The parties have not cited any Eleventh Circuit cases on this issue, and the only Code case on this issue cited by the parties is *In re Rodman*, 60 B.R. 334 (Bankr.W.D.Okla. 1986). *Rodman* involved a ten year lease, and the tenant had also been in bankruptcy and had rejected the lease after the lease had been in effect for less than a year. The total amount remaining due under the lease was $4.8 million, and the claim against the tenant in its bankruptcy had been limited under § 502(b)(6) to $700,-000.00. The Court limited the claim on the guaranty to the amounts described in 11 U.S.C. § 502(b)(6), finding that to allow the creditor its full claim would consume a substantial part of the property of the estate, while it could mitigate its damages by letting the property again. The Court cited the case of *Oldden v. Tonto Realty Corp.,* 143 F.2d 916 (2nd Cir.1944) for the proposition that allowance of landlords' claims in full did not seem appropriate, since other creditors would suffer proportionately and the claims themselves would often be disproportionate in amount to any damage suffered. Noting that a broad aim of the bankruptcy laws was to provide for as equitable a distribution of assets as is consistent with the type of claim involved, the court concluded that "considering the type of claim involved here equity, if not the literal language of the statute, requires that the limitations pertinent to rent claims be imposed." *Rodman*, 60 B.R. at 335.

Unlike the *Rodman* case, the equities of the case at bar do not compel limiting the guaranty claim. To allow RTIP its claim in the amount to which it would be entitled under state law would not consume a substantial part of the property of the estate to the detriment of other creditors. All of the other creditors in this case have been paid in full, and the debtor escrowed more than the amount of RTIP's claim, pending the outcome of this objection. Furthermore, RTIP's claim under state law is not disproportionate in amount to the damage suffered.

The legislative history does not suggest that § 502(b)(6) literally applies to a claim against a debtor-guarantor when the lessee is not a debtor and the guarantor has paid all other claims in full. The legislative history recites that the section is derived from current law and limits the damages allowable to "a landlord of the debtor". Interestingly, it does not say that the section limits the damages allowable to the holder of a guaranty of a lease. The legislative history also states that:

[t]he history of this provision is set out at length in *Oldden v. Tonto Realty Co.,* 143 F.2d 916 (2d Cir.1944). It is designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors

from recovering a dividend from the estate.... This paragraph will not overrule *Oldden*, or the proposition for which it has been read to stand: To the extent that a landlord has a security deposit in excess of the amount of his claim allowed under this paragraph, the excess comes into the estate.

S.R. No. 989, 95th Cong., 2nd Sess. 63 (1978), *reprinted in* 1978 *U.S.Code Cong. & Admin.News* 5849.

While the legislative history of § 502(b)(6) reaffirms the holding in *Oldden* with respect to the application of a landlord's security deposit, it does not state that this section should be applied automatically to limit a claim against a guarantor of a lease.

Since the legislative history states that § 502(b)(6) is derived from current law, it is useful to look at the pre-Code cases dealing with this problem under earlier versions of § 502(b)(6). The immediate predecessor to § 502(b)(6) of the Bankruptcy Code was found in several sections of the Bankruptcy Act. In cases under Chapters X, XI and XII, the Bankruptcy Act provided that:

> . [t]he claim of the landlord for injury resulting from the rejection of an unexpired lease of real estate ... shall be provable, but shall be limited to an amount not to exceed the rent, without acceleration, reserved by such lease for the three years next succeeding the date of the surrender of the premises to the landlord or the date of reentry of the landlord, whichever first occurs, whether before or after the filing of the petition, plus unpaid accrued rent, without acceleration, up to such date of surrender or reentry.

Bankruptcy Act § 202, 11 U.S.C. § 602; Bankruptcy Act § 353, 11 U.S.C. § 753; Bankruptcy Act § 458, 11 U.S.C. § 858.

In ordinary bankruptcies and cases under Chapter XIII, the Bankruptcy Act provided that a claim by a landlord for damages for injury resulting from the rejection of an unexpired lease of real estate was limited to rent for one year from the date of surrender or reentry plus the unpaid accrued rent up to that date. Bankruptcy Act

§ 63(a)(9), 11 U.S.C. § 103(a)(9); Bankruptcy Act § 642, 11 U.S.C. § 1042.

The original statute dealing with landlords' claims in corporate reorganization cases was a portion of § 77B of the Bankruptcy Act, 11 U.S.C. § 207(b)(10) added by an amendment in 1934. Section 207(b) was a lengthy subsection which described, among other things, the contents of a plan of reorganization. In clause 10, the statute provided a number of definitions and, in pertinent part, stated as follows:

> [i]n case an executory contract or unexpired lease of real estate shall be rejected ... any person injured by such rejection shall, for all purposes of this section and of the reorganization plan, its acceptance and confirmation, be deemed to be a creditor. The claim of a landlord for injury resulting from the rejection of an unexpired lease of real estate or for damages or indemnity under a covenant contained in such lease shall be treated as a claim ranking on a parity with debts which would be provable under section 103(a) of this title, but shall be limited to an amount not to exceed the rent, without acceleration, reserved by said lease for the three years next succeeding the date of surrender of the premises to the landlord or the date of reentry of the landlord, whichever first occurs, whether before or after the filing of the petition, plus unpaid rent accrued up to such date of surrender or reentry.

Bankruptcy Act § 77B, 11 U.S.C. § 207(b)(10).

It is important to recognize that one of the primary purposes of the original statute allowing landlords' claims with some limitations was to help landlords, not hurt them. Prior to the 1934 amendments of the Bankruptcy Act of 1898, landlords had no provable claim for rent accruing after the trustee's rejection of a lease. The claim for future rent was not discharged and the landlord did not share in the distribution. "This state of the law involved elements of hardship to both lessor and lessee. In the case of a corporate, and often in that of an individual lessee, the landlord's right to collect rent from a bank-

rupt tenant was valueless." *City Bank Farmers Trust Co. v. Irving Trust Co.,* 299 U.S. 433, 437, 57 S.Ct. 292, 294, 81 L.Ed. 324 (1937). "The tenant's bankruptcy removed all his assets from the reach of the landlord and left, as the latter's only remedy, suits against an empty corporate shell or a destitute individual." *Kuehner v. Irving Trust Co.,* 299 U.S. 445, 453, 57 S.Ct. 298, 302, 81 L.Ed. 340 (1937).

The *Oldden* case discusses the policy behind this statute. Landlords, particularly in the Depression years, were hard hit by bankruptcies of corporate tenants, for even though the claim survived the bankruptcy, the corporate entities often did not, and all the landlord had was a valid claim against a permanently dead or defunct corporation. Furthermore, the policy of getting a discharge of debts was thwarted by the non-dischargeable character of large rent claims. As a matter of policy, allowance in full of these claims did not seem fair since general creditors would suffer proportionately, and the claims themselves would often be disproportionate in an amount to any actual damage suffered. Thus, in 1934, Congress adopted amendments making claims for future rents specifically provable. The amendments were a compromise and imposed on the creditor a limited sacrifice in order to achieve the debtor's rehabilitation by extending the scope of the discharge. *Oldden,* 143 F.2d at 920.

There are three Second Circuit cases cited by the debtor which discuss earlier versions of § 506(b)(2), *Hippodrome Building Co. v. Irving Trust Co.,* 91 F.2d 753 (2nd Cir.1937), *In re Schulte Retail Stores Corp.,* 105 F.2d 986 (2nd Cir.1939), and *Oldden.* In *Hippodrome,* the debtor in a reorganization under § 77B of the Bankruptcy Act had guaranteed a lease of a theater by the debtor's subsidiary. The lessee had previously defaulted and had also been adjudicated a bankrupt. The lease was for a term of seventeen years at an annual rental of $150,000.00. The landlord found it impossible to let the theater on a cash basis and leased it to another tenant agreeing to take as rent some percentage of profits realized by a pool of theaters. The court below had limited the claim to the rent up until the date that the premises were relet, finding that the basis upon which the landlord relet the premises imposed a risk which the guarantor debtor had not accepted. The Second Circuit reversed the decision below, finding that the lessor was only trying to do the best he could, and that stipulations by the parties demonstrated that no cash rental could be had. At the end of the opinion, the Court considered the three year limit imposed by 11 U.S.C. § 207(b)(10) upon claims for injuries resulting from the rejection of a lease. The Court stated:

> *[t]his is not such a claim of course, and the letter of the statute does not apply to it;* yet it seems to us incredible that it should not go so far, and that the claim should be good for the full 17 years during which the lease will run. If so, a guarantor in reorganization is liable for more than his principal; that cannot be the meaning of the statute; the guaranty is a secondary obligation and must be subject to the same limitations as the primary.

*Hippodrome,* 91 F.2d at 756 (emphasis added).

The Court then directed that the damages be liquidated through the end of the term and that the claim be limited by three years' gross rents totaling $450,000.00.

It is significant that the Court in *Hippodrome* stated that the claim against a guarantor was not one that arose as an injury resulting from the rejection of a lease and that the letter of the statute did not apply to it. The Court applied the limitation not because the statute literally applied but because of the equities of the case, finding that it would have been "incredible" to allow a claim for the full seventeen years. *Schulte* simply relies on *Hippodrome* to conclude that the amount provable against the lessee's surety in bankruptcy is limited to the amount provable against the lessee in bankruptcy. Again, the lessee here, Big Harvest, is not in bankruptcy and any claim against it has not been limited.

The *Oldden* case, decided by the Second Circuit seven years after *Hippodrome,* also

does not require a literal application of the statute to a claim on a guaranty. The *Oldden* case itself involved a straight bankruptcy, not a corporate reorganization. The dispute did not involve a guaranty claim, but involved whether the landlord could keep its security deposit, in view of the statute limiting landlords' claims. The issue in *Oldden* was whether a security deposit should be deducted from the provable claim or from the smaller allowable claim. The court considered the background and history of the legislation and concluded that the statute set "a limit on damages for breach of a lease by bankruptcy." *Oldden*, 143 F.2d at 921. Here, the Lease was not breached by a bankruptcy. Big Harvest did not file a bankruptcy case and RTIP was led to believe Big Harvest would be using the premises as a commissary for months after the guarantor Danrik filed its Chapter 11 case.

The debtor cites two other cases in support of its position, *In re Unishops, Inc.*, 2 B.C.D. 1735 (Bankr.S.D.N.Y.1977) and *Fisher v. Lee Bros. Value World, Inc. (In re Lee Bros. Value World, Inc.)*, 486 F.2d 1037 (9th Cir.1973). In *Unishops*, a Bankruptcy Act case, the Chapter XI debtor guaranteed its subsidiary's obligation under a lease with the claimant. The claimant filed a claim for $16,260,000.00 for damages for the remaining twenty-one years of the lease. The lessee had also filed a Chapter XI case, and the lease had been terminated. The debtor moved to reduce the claim to the amounts permitted under § 353 of the Bankruptcy Act, and the Court held that § 353 limited the landlord's claim against a guarantor as well as a lessee. Unlike the case at bar, the full claim against the guarantor was disproportionately large and the tenant had also filed for relief under Chapter XI. The Court in *Unishops* stated that its reading of § 353 and the Second Circuit's reading of § 353's predecessor "leave no play for the exercise of any equitable principles in favor of this landlord." *Unishops*, 2 B.C.D. at 1738. To the extent that *Unishops* held that the statute and prior case law require limiting claims against guarantors in *all* cases and that courts are not to consider the equities

of the particular case, this Court strongly disagrees. The Second Circuit *Hippodrome* case held that the statute was not literally applicable to guaranty claims and reached its decision by explicit reference to equitable principles.

In *Fisher v. Lee Bros. Value World, Inc. (In re Lee Bros. Value World, Inc.)*, 486 F.2d 1037 (9th Cir.1973), the debtor had guaranteed the obligations of its subsidiary under a lease. Thereafter, the subsidiary was merged into the parent guarantor. The debtor filed a Chapter XI under the Bankruptcy Act and rejected the lease. The landlord submitted two separate proofs of claim, one for a breach of the lease and one for a breach of the guaranty. The Ninth Circuit held that § 353 limited the amount by which the claims of the landlord are provable and allowable and emphasized Congress's desire to limit otherwise disproportionately large claims of landlords. The opinion does not reveal the term of the lease or the amounts of the claims involved, but the Court found there that application of § 353 was required to limit a disproportionately large claim.

While the Court in *Rodman*, the only Code case, and the Courts in the Act cases of *Hippodrome* and *Fisher* limited the claim against the debtor-guarantor pursuant to the formula in § 502(b)(6) or its predecessors, they did so by reference to equitable principles and findings that allowance of the claim in full would consume a substantial part of the property of the estate to the detriment of other creditors or that the full claim was disproportionately large compared to the damage suffered. This Court agrees that in most cases, the application of equitable principles would result in limiting the allowable claim by a landlord against a bankrupt guarantor pursuant to § 502(b)(6). However, the facts in the case at bar are unusual and it would be unfair to limit RTIP's claim by applying § 502(b)(6).

First, limiting RTIP's claim against Danrik under § 502(b)(6) does not serve any of the policies or purposes of the statute. Allowing the claim for damages in the amount permitted under state law results

in a claim of $284,704.85 plus reasonable attorney's fees. Allowing the claim in this amount will not destroy equality among creditors or result in a detriment to other creditors, since all other creditors have already been paid in full. If the guaranty claim by RTIP is reduced, the funds escrowed for the claim will not go to unsecured creditors. They will go back to the shareholders of Danrik, who are the very people who presumably owned the lessee Big Harvest, which itself never went in bankruptcy.

The debtor argues that the fact that all of its other creditors have been paid in full is irrelevant, that 100% distribution cases are not unheard of, and that Congress obviously contemplated 100% distribution cases when it enacted § 502(b)(6). This Court does not find anything in the legislative history to suggest that Congress contemplated 100% distribution cases, and, in this Court's experience, 100% distribution cases are quite uncommon. Foreseeing the absurdity of applying the limitation on rent to a claim against a solvent guarantor, Judge Frank, in a strong dissent in *Oldden* stated "I have found no cases in which, since the 1934 amendment, a suit was brought against the solvent surety or guarantor of a lease of a bankrupt tenant." *Oldden*, 143 F.2d at 923 n. 4. Now, forty-four years later, we have such a case involving a claim against a solvent Chapter 11 guarantor, and it would be unfair and inconsistent with any statutory purpose to treat RTIP worse here than it would be treated outside of bankruptcy.[3]

Second, allowing RTIP's claim in the amount permitted under state law will not destroy the rehabilitation efforts of Danrik, since Danrik has already been reorganized and the plan has been consummated.

Third, unlike the claims in *Rodman, Hippodrome, Fisher*, and *Unishops*, RTIP's claim under state law is not disproportionately large in relation to the damage suffered. Indeed, the amount which the parties agree is the claim under state law— $284,704.85 plus attorney's fees—is not the full amount of rent under the term of the Lease, but has been reduced by the fair rental value of the premises for the remainder of the term. Furthermore, RTIP has and will incur expenses in excess of the amount allowed by applying § 502(b)(6). RTIP spent $145,310.00 to remodel the premises to fit the specifications of Big Harvest, and RTIP paid leasing commissions of $16,634.20. It was undisputed that RTIP will have to spend an additional $36,800.00 to remove the improvements so that the space can be put back in a rentable condition. These amounts exceed any possible calculation derived from applying § 502(b)(6).

Finally, it is difficult to calculate the claim under § 502(b)(6) when the lessee never filed a petition.[4] The wording of § 502(b)(6) measures the amount of the allowable claim by the amount of time remaining under the lease following the *earlier of the filing of the petition* and the date on which the lessor repossessed, or the *lessee* surrendered, the leased property.

---

**3.** Thomas H. Jackson, Arnold H. Leon Professor of Law and Dean of the University of Virginia School of Law, criticizes the Bankruptcy Code's treatment of landlords' claims arising out of long-term leases as inconsistent with the collectivization norm. He states:

> [t]he claims of landlords are determined according to standard contract expectancy formulas. If the nominal claim is large, it is only because the damages, calculated in ordinary ways, are large. Uncertainty about the future, moreover, does not necessarily favor a landlord. The nature of uncertainty is that things may end up better or worse than today's best guess.... Claimants that are treated better outside of bankruptcy (because they are accorded larger nominal claims) are simply not equals in bankruptcy.... Bankruptcy

moves from the individual to the collective. If landlords do better in the nonbankruptcy regime, then they should do better in bankruptcy as well. Casting the issue as one of bankruptcy policy misstates what is at issue and creates incentives to use bankruptcy for reasons that may not be collectively optimal. T. Jackson, *The Logic and Limits of Bankruptcy Law* 57 (1986).

**4.** Indeed, Danrik has offered three alternative methods of calculating the claim: method 1 yields the amount of $62,565.75; method 2 yields the amount of $83,421.00; and method 3 yields the amount of $9,269.00. The third method measures the claim from the date Danrik, the guarantor, filed its petition.

Here, the lessee Big Harvest never filed a petition and the Lease was not abandoned by Big Harvest until some seven or eight months after Danrik filed its petition. The only logical reading of the statute is that it refers to the filing of the lessee's petition, not the petition of the guarantor. It would be unfair to begin measuring the one-year limitation from the date of the filing of the guarantor's petition, when the lessee never filed a petition and led the landlord to believe that it would be occupying the premises.

In summary, the Court does not find that § 502(b)(6) literally applies to limit RTIP's claim, and thus the equities of the particular case must be considered. Given the facts of this unusual case where we have a solvent guarantor-debtor, where all other claims have been paid in full, where the lessee itself has not sought the protection of the bankruptcy court, and where the claim is not disproportionately large, the Court overrules the debtor's objection to that portion of RTIP's claim which exceeds the formula in § 502(b)(6).

Accordingly, RTIP's claim is allowed in the amount of $284,704.85 plus reasonable attorney's fees. The parties stipulated that RTIP's attorney's fees totaled $30,027.27, but that the number was subject to verification by Danrik. The parties are directed to confer and submit a pleading within thirty (30) days of the entry of this Order notifying the Court whether they have stipulated to RTIP's claim for attorney's fees.

IT IS SO ORDERED.