In the Matter of **FEDERATED DEPARTMENT STORES, INC. and Allied Stores Corporation, et al., Debtors.**

No. C–1–91–191.

United States District Court, S.D. Ohio, E.D.

Sept. 24, 1991.

See also 132 B.R. 572.

**810**

Edmund John Adams, Frost & Jacobs, Cincinnati, Ohio, for plaintiff.

Thomas C. Clinton, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, Mich., for defendants.

## OPINION AND ORDER

GRAHAM, District Judge.

City Center Limited Partnership ("City Center") appeals from an order of the United States Bankruptcy Court, in which the court granted the motion of the debtors, Federated Department Stores, Inc. ("Federated") and Block's, Inc. ("Block's") (collectively "debtors") to reject an unexpired lease for non-residential real property pursuant to 11 U.S.C. § 365(a). City Center also appeals the bankruptcy court's denial of City Center's motion to compel debtors to comply with the lease. This appeal presents three issues: whether the bankruptcy court applied the proper standard in granting debtors' motion to reject the lease; whether the bankruptcy court erred in giving retroactive effect to its decision authorizing debtors' rejection of the lease; and whether the bankruptcy court erred in holding that the statutory cap on damages set forth in 11 U.S.C. § 502(b)(6) was applicable to City Center's claim.

## I.

On June 29, 1984, City Center entered into an agreement with Allied Stores of Michigan to lease a retail department store at the City Center Plaza in Grand Rapids, Michigan. The lease was to expire on January 28, 2006. Through a series of assignments and mergers, the lease was eventually transferred to Block's, a wholly-owned subsidiary of Federated. The store was operated by Federated under the name "Lazarus," and although Block's held the lease, Federated paid the rent due under the lease directly to City Center. The minimum monthly rent payments under the lease were $35,416, plus maintenance costs, taxes and utilities.

On January 15, 1990, Federated, Block's and sixty-five affiliates filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. § 1101 *et seq.* It is undisputed that the subject Lazarus store continuously operated at a loss from the time it was acquired by Federated in 1987. In fact, it was the worst performing Lazarus store in the United States. With annual sales declining, losses were expected to increase unless the store was closed. In addition, large portions of the City Center Plaza Mall were vacant, and at the time of the bankruptcy court's order, the Lazarus store was the only retail tenant on the Plaza's third floor. At that time, the next largest retail store, Gantos, had attempted to close its store, and the landlord was in the process of converting portions of the City Center Plaza from retail to office space. It is also not disputed that the city of Grand Rapids was economically depressed.

In early July 1990, the debtors determined that closing the subject Lazarus store was in the best interests of the debtors and their respective estates. On July 13, 1990, debtors filed a motion requesting authority to reject the unexpired City Center Plaza lease. In their motion, debtors requested that the effective date of the rejection be October 3, 1990. City Center filed an objection to debtors' motion on August 1, 1990.

The bankruptcy court held a hearing on August 23, 1990 to consider debtors' motion to reject. At that time, the parties presented their arguments and the bankruptcy court took the matter under advise-

ment, indicating that it would announce its decision in one or two weeks. On September 3, 1990, the Lazarus store was closed and post-petition rent was paid through the end of September 1990. On October 26, 1990, City Center filed a motion to compel debtors to continue to pay rents due under the lease. The bankruptcy court, by an order dated January 28, 1991 (available on Westlaw, FBKR–FDS data base: Camp 3304), granted debtors' motion to reject the lease and denied City Center's motion to compel debtors to continue performance under the lease. City Center appeals from the bankruptcy court's January 28, 1991 order.

## II.

A bankruptcy court's findings of fact must be upheld unless clearly erroneous. Bankr.R. 8013; *In re Southern Industrial Banking Corp.*, 809 F.2d 329, 331 (6th Cir. 1987). A bankruptcy court's conclusions of law, however, are reviewed *de novo*. *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 389 (6th Cir.1986).

## III.

The first issue presented on appeal is whether the bankruptcy court applied the correct standard in authorizing debtors' rejection of the City Center Plaza lease. In the proceedings below, the bankruptcy court applied the well-established business judgment test, whereby the court examined whether the proposed rejection would be advantageous to the debtor. On appeal, City Center argues that the bankruptcy court's decision was erroneous because the bankruptcy court refused to require a showing that the rejection would benefit creditors. Specifically, City Center maintains that the rejection should not have been authorized because Block's Chapter 11 schedules indicate that Block's is solvent. That is, City Center contends that even if the rejection was not authorized, Block's would be able to pay all of its creditors in full other than its sole shareholder, Federated. If Block's other creditors can be paid in full without the rejection of the lease, City Center argues, then

the rejection of the lease would not benefit Block's creditors and should therefore be disapproved. City Center also asserts that the bankruptcy court erred in refusing to require the debtors to demonstrate that the decision to reject was Block's independent business judgment.

11 U.S.C. § 365(a) provides in pertinent part:

[T]he trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

Section 365(a) does not provide a standard for determining when rejection of an unexpired lease is appropriate. *See In re Monarch Tool & Mfg. Co.*, 114 B.R. 134 (Bankr. S.D.Ohio 1990). Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of executory contracts and unexpired leases. *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523, 104 S.Ct. 1188, 1194–95, 79 L.Ed.2d 482 (1984); *see also Group of Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943).

As a general rule, a bankruptcy court presented with an application to disaffirm the obligations of an executory contract need determine only whether it is indeed executory and whether disaffirmance would be advantageous to the debtor. [cites omitted]. The burden or hardship which rejection would impose on other parties to such a contract is not a factor to be weighed by the bankruptcy court in ruling upon the debtor's application.

*Borman's, Inc. v. Allied Supermarkets, Inc.*, 706 F.2d 187, 189 (6th Cir.) (*dicta*), *cert. denied*, 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247 (1983). In the proceedings below, the bankruptcy court, following *Borman's*, approved debtors' rejection of the lease on the basis of its determination that the rejection was advantageous to the debtors.

City Center does not dispute that the rejection was, in fact, advantageous to the debtors. Rather, relying on case law from outside the Sixth Circuit, City Center ar-

gues that the bankruptcy court should have considered whether the rejection of the City Center Plaza lease was of any benefit to Block's creditors. City Center relies primarily on two decisions in making this argument: *In re Chi–Feng Huang*, 23 B.R. 798 (9th Cir.BAP 1982); *In re Meehan*, 59 B.R. 380 (Dist.E.D.N.Y.1986). In *Huang*, the debtors in related cases sought to reject an executory contract for the sale of an apartment building they owned. The purchase price of the building was $1,900,-000. The parties in *Huang* stipulated that the value of the building was $2,400,000. The buyer in *Huang* opposed the rejection, arguing that the benefit of the rejection would inure to the debtors because the additional value retained by the estate would ultimately be used to pay "questionable" claims filed by the debtors' friends and relatives. The bankruptcy court agreed with the buyer, and refused to authorize the rejection.

The appellate panel in *Huang* reversed the judgment of the bankruptcy court because the bankruptcy court improperly disregarded the allegedly "questionable" claims out of hand, without a hearing. In the instant case, City Center relies on the following language in *Huang:*

> If without regard to rejection of the contract, the estate is solvent and the unsecured creditors would receive 100 percent of their claims, rejection would then accomplish nothing for the general unsecured creditors. We do not doubt that if in the judgment of the bankruptcy court, an estate is solvent in the sense that a 100 percent pay out will occur in the event of liquidation, that it is within the discretion of the court to decline to authorize rejection of a contract on the grounds that no benefit would accrue to the creditors from the rejection. In such circumstances, rejection might only impose unwarranted administrative expenses or delay.

However, it is not true that solvent debtors may petition for bankruptcy and then obtain a windfall by rejecting their executory contracts as was argued by Pierce. Such a view ignores the fact that in the event of liquidation the party whose contract is rejected must have his claim satisfied before the debtor may obtain recovery. See 11 U.S.C. § 726. In the case of reorganization, the "best interests of the creditors" test gives the creditor equal advantage. See 11 U.S.C. §§ 1123–24, 1129.

The debtors thus cannot become the primary beneficiaries of rejection directly. 23 B.R. at 803. The other case upon which City Center relies, *Meehan*, was a Chapter 13 case in which the debtor had entered into a contract for the sale of her home. The debtor breached the contract, and the buyers obtained a judgment in state court awarding specific performance. The debtor then filed her Chapter 13 petition, and sought to stay the state court proceedings and to reject the contract. The bankruptcy court in *Meehan* declined to authorize the rejection of the contract. The bankruptcy court reasoned that the rejection of the contract would not benefit unsecured creditors because, with or without rejection, the creditors would have been paid 100 percent. The district court in *Meehan* affirmed, following *Huang*. 59 B.R. at 385–86.

■ For several reasons, the Court declines to reverse the judgment of the bankruptcy court in the instant case on the basis of *Huang* and *Meehan*. First, the principles enunciated in *Huang* and *Meehan* are at odds with the business judgment test set forth in *Borman's*. Under *Borman's*, the bankruptcy court "need determine only ... whether disaffirmance would be advantageous to the *debtor*." 706 F.2d at 189 (emphasis added). The Sixth Circuit test requires the bankruptcy court to examine the impact of the decision to reject on the debtors, not the general unsecured creditors. The bankruptcy court did not err in following the controlling authority of *Borman's*.

■ Moreover, even if this Court were to follow *Huang* and *Meehan*, reversal of the bankruptcy court's decision would not be dictated. The court in *Huang* stated that "it is within the *discretion* of the court to decline to authorize rejection of a contract on the grounds that no benefit would ac-

crue to the creditors from the rejection." 23 B.R. at 803 (emphasis added); *Meehan,* 59 B.R. at 385. In the instant case, the bankruptcy court made the following observations:

> We further reject the suggestion that the Court engage in a solvency analysis each time the Debtor in Possession wants to reject a lease. Such an exercise is not contemplated in Bankruptcy Code § 365 and the duty to determine the solvency of potentially each of the sixty-seven debtors in this consolidated case could erect an unsurmountable barrier to the efficient administration of this case.
>
> City Center's conclusion that Block's is solvent may be erroneous. Although Block's schedules filed January 15, 1990 might reflect solvency, it has contingent liabilities including potentially $1 Billion in federal tax liability claims. The tentativeness of Block's solvency is further indication that the landlord's proposed solvency test is unworkable.

Bankruptcy Court Opinion, Jan. 28, 1991 pp. 9–10. In this regard, the instant case is distinguishable from both *Huang* and *Meehan,* which were both essentially consumer bankruptcies. The bankruptcy court in the instant case did not abuse its discretion by taking into account the adverse impact that the solvency analysis would have on the efficient administration of this large and complex Chapter 11 case. Efficient administration ultimately benefits all creditors.

█ In essence, City Center's argument is that a debtor-in-possession's actions must always be to the benefit of the general unsecured creditors, and here the rejection of the lease does not benefit City Center, or Block's other unsecured creditor. The duty to which City Center refers, however, primarily entails conserving the assets of the estate so that they can be used to pay the creditors' lawful claims. *See Ford Motor Credit Co. v. Weaver,* 680 F.2d 451, 461 (6th Cir.1982). It does not include, as the debtors point out, maximizing a particular creditor's claim. In other words, a debtor in possession is not obligated to act in such a way so as to ensure that a creditor is able to file the largest possible claim. For the same reasons, the Court rejects City Center's argument that the result of the rejection is that Block's shareholder, Federated, will effectively be paid out of turn contrary to the policy of the Bankruptcy Code. Federated's claims, whatever they may be, will not be paid out of order; rather, City Center's claim simply will not be maximized.

█ Under 11 U.S.C. § 365(g), a rejection of an unexpired lease is treated as a breach of contract and the injured party is entitled to file a claim for damages. But for the operation of 11 U.S.C. § 502(b)(6), City Center's claim would obstensively be $10 million. Section 502(b)(6), however, limits damages resulting from a termination of a lease of real property to the greater of rent for one year or 15 percent of the remainder of the lease, not to exceed three years rent. Given that the result City Center seeks is continued performance under the lease, its grievance is, as the bankruptcy court observed, not with Block's business judgment, but with the statutory cap on its damages and the treatment of its claim as general and unsecured as opposed to administrative. City Center's challenge to the literal application of § 502(b)(6) will be discussed in detail below. Suffice it to say, however, that a debtor's duty to unsecured creditors who happen to be lessors does not include the performance of an otherwise useless act for the sole purpose of helping the lessor to avoid the statutory cap of § 502(b)(6).

█ City Center also argues that the rejection should not have been authorized because the decision was made by Federated and did not represent the independent business judgment of Block's. The Court finds this argument to be unpersuasive. It is undisputed that the subject Lazarus store was the worst performing Lazarus in the country, and that the store was suffering increasing losses. It is also not disputed that the situation at the Plaza was deteriorating: the Lazarus was the only remaining retail store on the Plaza's third floor, and the next largest retailer in the Plaza had attempted to close. Large areas of the Plaza were vacant and the landlord was in the process of converting portions

of the Plaza from retail to office space. In addition, the city of Grand Rapids was economically depressed. In these circumstances, Federated's decision to close the subject Lazarus store cannot seriously be questioned. The decision to close the store left Block's with the prospect of paying rent on an empty space or breaching the lease rather than rejecting it, thereby putting City Center in the position in which it could avoid the cap of § 502(b)(6). It is inconceivable that Block's, exercising its own business judgment independent of Federated, would have concluded that continuing to pay $35,416 per month to rent an empty space would be a wise decision from a business standpoint. Likewise, there would have been no legitimate business reason for Block's to breach the lease and subject itself to a larger claim.

Based on the foregoing, the Court concludes that the bankruptcy court applied the correct standard in determining whether to authorize the debtors' rejection of the City Center lease.

### IV.

The second issue presented is whether the bankruptcy court erred in retroactively approving October 3, 1990 as the effective date of rejection rather than deeming the date of rejection to be the date of its decision, January 28, 1991. The bankruptcy court concluded that it would be unfair to compel debtors to pay additional rent caused by a delay over which they had no control. City Center argues that the effective date of rejection should be January 28, 1991 rather than October 3, 1990.

■ The determination of the effective date of rejection is significant because 11 U.S.C. § 365(d)(3) provides in part that:

The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, *until such lease is assumed or rejected,* ...

(emphasis added). A lessor is entitled to rent as a postpetition administrative expense until the lease is rejected by opera-

tion of 11 U.S.C. § 365(d)(4) or with court approval. *See In re National Oil Co.,* 80 B.R. 525, 527 (Bankr.D.Colo.1987). Thus, if City Center is correct and the effective date of rejection of the lease is the date of the bankruptcy court's order approving rejection, January 28, 1991, then City Center is entitled to the rent due from October 3, 1990 to January 28, 1991 as an administrative expense. If City Center is incorrect, it is entitled only to a general unsecured claim for all unpaid rents, subject to the provisions of 11 U.S.C. § 502(b)(6).

■ 11 U.S.C. § 365(a) provides in part that "the trustee, *subject to the court's approval,* may assume or reject any executory contract or unexpired lease of the debtor." (emphasis added). Under the plain language of § 365(a) court approval is required for rejection of an unexpired lease. The issue here, however, is whether the effective date of rejection for purposes of § 365(d)(3) is the date of the bankruptcy court's order approving rejection, or some other, earlier date.

Bankruptcy courts faced with this issue have reached a variety of results. Some courts have held that the effective date of rejection is the date of the bankruptcy court's order approving rejection. *See e.g., In re Worths Stores Corp.,* 130 B.R. 531 (Bankr.E.D.Mo.1991); *In re Virginia Packaging Supply Company,* 122 B.R. 491, 493 (Bankr.E.D.Va.1990); *In re Revco D.S., Inc.,* 109 B.R. 264 (Bankr.N.D.Ohio 1989); *In re National Oil Co.,* 80 B.R. 525, 526 (Bankr.D.Colo.1987). At least two bankruptcy courts, however, have concluded that rejection is effective when the lessor receives unequivocal notice of the trustee's intent to reject. *In re Mid Region Petroleum, Inc.,* 111 B.R. 968 (Bankr. N.D.Okl.1990); *In re 1 Potato 2, Inc.,* 58 B.R. 752 (Bankr.D.Minn.1986). One bankruptcy court has suggested in dicta what amounts to a middle ground, opining that it could issue a *"nunc pro tunc"* order retroactively setting as the effective date of approval any date after the filing of the motion to reject if the lessor would not be prejudiced as a result. *In re Garfinckels, Inc.,* 118 B.R. 154 (Bankr.D.D.C.1990). Of

the foregoing decisions, this Court finds the reasoning in Judge Harold F. White's opinion in *Revco* to be most persuasive.

In *Revco*, the debtor in possession was a sublessee of a warehouse. On October 24, 1988 the debtor in possession sent a letter to the sublessor informing it that the debtor in possession was, as of the date of the letter, rejecting the sublease. The debtor in possession filed a motion on November 23, 1988 seeking the bankruptcy court's approval of the rejection. After notice and a hearing, the bankruptcy court in *Revco* issued its decision approving the rejection of the sublease on December 13, 1988. The court took the matter of the effective date of the rejection under advisement. The debtor in possession argued that the effective date of rejection was the date of its letter to the sublessee, October 24, 1988. The sublessee argued that the rejection was not effective until the date of the bankruptcy court's decision, December 13, 1988.

The court in *Revco* held that the effective date of the rejection was the date of the order approving rejection, December 13, 1988. 109 B.R. at 268. The court first noted that a majority of bankruptcy courts have held that judicial approval is required for rejection. *Id.* The court also examined the policy considerations underlying the rule:

> Section 365 and the accompanying Bankruptcy Rules are designed to provide a degree of factual certainty in determining the actual date of rejection. Moreover the requirements of notice and opportunity for a hearing under Bankruptcy Rule 9014 provide the creditors and the court with an opportunity to examine the efficacy of a debtor's decision to reject a lease under the guidelines of the business judgment test. It may be, on certain occasions, that a debtor's decision to reject an unexpired lease would not be in the best interests of the estate or the creditors, and the requirement of court approval operates as a safeguard to protect against a unilateral decision by the debtor that could be prejudicial to the creditors.

*Revco*, 109 B.R. at 269 (quoting *In re National Oil Co.*, 80 B.R. 525, 526 (Bankr. D.Colo.1987)). The court also observed that to set the effective date of rejection earlier than the order approving it would put the lessor in an unfairly awkward position: even though the debtor in possession may already have left the premises and may no longer be paying rent, the lessor would be ill-advised to relet the property because the court may not approve the rejection. *Id.*

█ The bankruptcy court in the instant case concluded that "[i]t would be unjust to force the Debtors to pay for time that elapsed over which Debtors had little control." This conclusion, however, fails to consider that City Center had no more control over the delay in the issuance of the bankruptcy court's decision than did the debtors. As a general rule, the party seeking relief in any court must bear the risk that the court may not reach a decision as quickly as the party expected or desired. Here, it was the debtors who necessarily sought court approval for rejection of the lease. The Court sees no reason for departing from the general rule in this case. If expedited relief is necessary, the moving party should be responsible for seeking such relief.

The Court also rejects the argument that City Center caused the delay by opposing the motion to reject, and should therefore, in effect, pay for the delay. To penalize City center for exercising its right to oppose the rejection would run counter to the policy behind the very rules that ensure lessors notice and the opportunity to be heard, *see* Bankr.Rules 6006(a) and 9014, as well as the court approval requirement of § 365(a), which necessarily contemplates that some time will be needed by the court to determine whether the rejection is in the best interests of the debtor.

For the foregoing reasons, the Court concludes that the bankruptcy court erred in retroactively approving October 3, 1990 as the effective date of the rejection of the lease. The Court holds that the effective date of rejection for purposes of 11 U.S.C. § 365(d) was the date of the bankruptcy

court's order approving the rejection, January 28, 1991.

## V.

The third and last issue presented on appeal is whether the bankruptcy court erred in applying the statutory cap on damages set forth in 11 U.S.C. § 502(b)(6) to City Center's claim. On appeal, City Center argues that the purpose of § 502(b)(6), to ensure equal distribution of funds among creditors, is not furthered in the instant case because the claims of all creditors can be satisfied even if the debtors must pay the full amount of City Center's claim. Essentially, this argument is the same as the solvency argument City Center presented in connection with § 365(a).

11 U.S.C. § 502(b)(6) provides as follows: Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and allow such claim in such amount, except to the extent that—

. . . . .

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
(A) the rent reserved by such lease, without acceleration, for the greater of one year, or fifteen percent, not to exceed three years, of the remaining term of such lease, following the earlier of—
(i) the date of the filing of the petition; and
(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

City Center's unadjusted claim is $10 million. When the statutory cap of § 502(b)(6) is applied, City Center's claim is limited to $1.5 million.

City Center argues that § 502(b)(6) was " 'designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate.' " *In re Vause*, 886 F.2d 794, 801 (6th Cir.1989) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 353 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6309)). City Center contends that § 502(b)(6) is inapplicable in the instant case because all of its creditors, except for its sole shareholder, Federated, would be paid in full even if the statutory cap were not applied.

City Center's reliance on *Vause* and the quoted legislative history is misplaced. *Vause* involved the rejection of a farm lease under which each rent payment was payable in arrears. The question presented in *Vause* is whether the "unpaid rent due under such lease" included the rent for three hundred sixty-one days prior to the filing of the petition where that year's rent was due, in arrears, four days after the filing of the petition. The court in *Vause* found that the language of the statute was unclear as applied to the facts of the case, and therefore examined the legislative history of the statute. There is no similar ambiguity in the instant case, and resort to legislative history is therefore neither necessary nor proper. *See United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). Under the plain language of the statute, the cap applies. Nothing in § 502(b)(6) suggests that an exception exists where all creditors could be paid in full even if the cap were not applied.

City Center has also not cited any cases that have recognized such an exception. This Court has found only one case in which the court declined to apply the cap of § 502(b)(6) for equitable reasons. *In re Danrik*, 92 B.R. 964 (Bankr.N.D.Ga.1988). In *Danrik*, the debtor, by its president, executed a lease guarantee agreement in favor of a lessor. The debtor filed a Chapter 11 petition, and the approved plan of reorganization provided that all unsecured creditors' claims would be paid in full.

The lessee in *Danrik* never took possession of the premises and never paid any rent under the lease. The lessee also never filed a bankruptcy petition. The lessor filed a claim for the full amount of the remainder of the lease. The debtor objected to the claim, arguing that it should have been limited to one year's rent under § 502(b)(6).

The court in *Danrik* first noted that § 502(b)(6) did not expressly include or exclude from its application the claim of a lessor against a debtor-guarantor. The *Danrik* court concluded that § 502(b)(6) did not "literally" apply and therefore examined the equities of the case. The unusual facts the court in *Danrik* considered included: the debtor-guarantor was solvent; all other claims had been paid in full; the lessee itself had not sought the bankruptcy court's protection; and the lessor's claim was not disproportionately large.

■ The instant case does not involve a debtor-guarantor, and the Court therefore cannot speculate, as did the court in *Danrik*, whether § 502(b)(6) literally applies. It clearly does apply. There is simply nothing in the plain language of § 502(b)(6) to suggest that a bankruptcy court may depart from the application of the cap on a lessor's claim any time the debtor is solvent or the court otherwise believes the equities of the case might warrant such a departure.

■ Furthermore, City Center would not prevail even if the same equitable factors considered in *Danrik* were applied to the instant case. First, City Center contends that Block's is solvent. However, as the bankruptcy court observed, calculating the solvency of the debtor every time a lease is rejected would create "an insurmountable barrier to the efficient administration of" this large, complex Chapter 11 proceeding. The efficient administration of this case ultimately benefits all creditors. Moreover, City Center's assertion that Block's is solvent apparently ignores a potential $1 billion in federal tax liability claims. Although City Center disputes the bankruptcy court's characterization of the potential tax claims, it has not demonstrated that the characterization is clearly erroneous. For these same reasons, the second factor considered by the court in *Danrik*, whether all claims will be paid in full, does not favor bypassing the cap of § 502(b)(6) in the instant case. Third, unlike *Danrik*, in the instant case the lessee has sought relief under Chapter 11.

Lastly, City Center's claim of $10 million is not on par with the lessor's claim in *Danrik*. In *Danrik*, the lessor's claim was ultimately for $284,704.85 plus attorney's fees. This amount was not the full amount of rent due under the remainder of the lease, and reflected a fair rental value of the premises for the remainder of the lease term. The claim in *Danrik* was also proportional because the lessor had spent $143,000 remodeling the premises to fit the lessee's specifications, had paid $16,634.20 in leasing commissions and spent $36,800 to remove the improvements so as to make the premises rentable. Hence, the lessor in *Danrik* demonstrated out-of-pocket expenses totaling nearly 70 percent of the amount the bankruptcy court was going to allow it to claim. In contrast, in the instant case, it appears that the majority of City Center's $10 million claim consists of lost rent payments.

*Danrik* has also been criticized as being contrary to a literal reading of § 502(b)(6). *See In re Thompson*, 116 B.R. 610 (Bankr. S.D.Ohio 1990). This Court is not faced with the question whether § 502(b)(6) applies to a debtor-guarantor. However, if it does apply, then bankruptcy courts are not free to engage in a balancing of equities in order to avoid the application of § 502(b)(6)'s plain, unambiguous language.

The plain meaning of legislation should be conclusive, except in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters."

*Ron Pair Enterprises*, 489 U.S. at 242, 109 S.Ct. at 1031 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). Here, City Center argues that § 502(b)(6) was "designed to compensate the landlord for his loss while not permitting a claim so

818

large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate." *Vause*, 886 F.2d at 801 (quote omitted). The bankruptcy court's decision in this case, however, does not thwart Congress' purpose. City Center is not being completely denied compensation and general unsecured creditors are not being prevented from recovering a dividend. Although the result in this case may not serve the stated purpose as directly as it does in other circumstances, it cannot be said that the result is demonstrably at odds with the intentions of the drafters of § 502(b)(6). In fact, the bankruptcy court's decision serves at least one of the purposes of § 506(b)(6): to limit damages claimed for breach of a long-term commercial lease, which have historically been viewed as contingent and difficult to prove. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 2266 (1978) U.S.Code Cong. & Admin.News 1978, p. 5850. Thus, the bankruptcy court did not err in applying § 502(b)(6) literally.

In sum, even if this Court were to accept the proposition that departure from the plain language of § 502(b)(6) is permissible when the debtor is solvent or when the equities of the case otherwise suggests such a departure, the Court would still not find that such a departure was mandated in the instant case. However, the unambiguous language of § 502(b)(6) does not, in any event, provide any exception to the application of the cap to a lessor's claim.

For the foregoing reasons, the Court concludes that the bankruptcy court did not err in applying the statutory cap of § 502(b)(6) to City Center's claim.

Based on the foregoing, the judgment of the bankruptcy court is AFFIRMED in part, and in part REVERSED and REMANDED for further proceedings consistent with Section IV of this opinion and order. Each party shall bear its own costs.

It is so ORDERED.