**In re James Bronce HENDERSON, III, Debtor.**

**No. 02–16887–9P1.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Aug. 5, 2003.

Louis X. Amato, Louis X. Amato, P.A., Naples, FL, John D. Emmanuel, Fowler, White, Boggs, Banker, P.A., Hywel Leonard, Carlton Fields, Tampa, FL, Timothy A. Fusco, Troy, MI, Michael C. Hammer, Detroit, MI, Mark Shapiro, Southfield, MI, Arthur J. Spector, Berger Singerman, Fort Lauderdale, FL, for Creditors.

Lynn V. Cravey, Asher Rabinowitz, Ruden, McClosky, Smith et al., St. Petersburg, FL, Christopher A. Grosman, Birmingham, MI, for Debtor.

T. Patrick Tinker, Office of the U.S. Trustee, Tampa, FL, for U.S. Trustee.

### ORDER ON DEBTOR'S OBJECTION TO CLAIM No. 71 OF VAN BUREN INDUSTRIAL INDUSTRIES

#### (Doc. No. 81)

ALEXANDER L. PASKAY, Chief Judge.

This is the second prong of the attack by James Bronce Henderson, III (Debtor or Henderson) on claims filed by 6700 Development Associates, L.L.C. and the other

by Van Buren Industrial Investors L.L.C. (Van Buren or Landlord), both former landlords of DCT Inc. (DCT). DCT, a now defunct corporation, was a Debtor in a Chapter 7 liquidation case. The Debtor, as principal of DCT, personally guaranteed both leases. The Objection to the Claim of 6700 was heard on July 7th, 2003. This Court entered its Memorandum of Opinion and reset for trial one remaining unresolved issue. The immediate matter under consideration is the Debtor's Objection to Claim No. 71, which was filed by Van Buren in the amount of $18,410,514.73. This total has the following components:

(1) $1,154,645.49 for unpaid rent and related charges up to the commencement of this Chapter 11 case (Van Buren Ex. 4)

(2) $813,000.00 for unpaid rent and related charges from September 2002 through December 2002 (the date the Proof of Claim was filed)

(3) The present value of the rent and related charges from January 2003 to November 2009 (based on the agreed discount rate in the DCT Lease) of $16,590,931.24

(4) After crediting the security deposit in the amount of $148,062.00, the readjusted balance is $18,410,514.73.

The Debtor's Objection to Claim No. 71 is based on four separate grounds. First, the Debtor contends that Van Buren failed to establish the fair market rental value of the property leased to DCT under Michigan law for the remaining seven-and-a-half years remaining on the DCT Lease (Db. Ex. 1, hereinafter, Van Buren Lease). Second, the Debtor asserts that Van Buren failed to mitigate its damages by renting the property involved at the fair market rate. Third, the Debtor alleges Van Buren is barred from claiming damages in excess of the amount it claimed in the Chapter 7 case of DCT in Michigan and

has miscalculated its damages in the DCT claim. Finally, the Debtor alleges that he has been released from his guaranty obligations as a result of the surrender of the DCT Property on April 21, 2002 by the DCT Trustee to Van Buren.

In response to the Debtor's Objection to its claim, Van Buren contends that the burden to overcome the *prima facia* validity of its claim is on the Debtor, and the mere fact that the claim under consideration was challenged is insufficient to overcome the presumptive validity of the claim unless the objection is supported by substantial evidence. *See In re Hemingway Transport, Inc.,* 993 F.2d 915, 925 (1st Cir.1993). According to Van Buren, the Debtor failed to present sufficient evidence to defeat the claim by probative force at least equal to that of the allegations set forth in its claim. Therefore, the objection must fail and the claim should be allowed as filed.

The record as established at the Final Evidentiary Hearing by testimony of witnesses and the documentary evidence offered and admitted in evidence by both sides can be summarized as follows:

The Debtor obtained an undergraduate degree in metallurgical engineering and a Master's degree in Business Administration. Upon graduation in 1973, the Debtor worked in quality engineering, manufacturing engineering, and marketing. In 1980, the Debtor moved back to Detroit and joined his father at DCT.

In 1966, the Debtor's father formed DCT. DCT operated as a machine shop fabricating parts details for the automotive industry and for machine tool companies. Soon after joining the company in 1980, the Debtor became its President and operated DCT until February 14, 2002. On that date, some of DCT's creditors filed an involuntary Chapter 7 bankruptcy petition

against DCT, which was shortly thereafter followed by the entry of an Order for Relief.

This ironic turn of events was surprising, especially since under the Debtor's stewardship, between 1980 and 2000, DCT grew from 22 employees to more than 1,000. At its peak in 2000, DCT's gross sales topped $200 million dollars and the company became one of North America's largest robotics integration companies. In addition to running DCT, the Debtor also established two companies that owned real estate: James Bronce Henderson Real Estate Limited Partnership and Henderson Properties, L.L.C. These companies leased to DCT and another company property for the various companies' needs. Ninety to ninety-five percent of the industrial real estate space was used for automotive manufacturing purposes and the balance was utilized for offices within the industrial space.

From time to time, DCT operated out of more than one location. In fact, at the time of the involuntary bankruptcy, DCT occupied five significant facilities, with a total of about one million square feet. The majority of DCT's customer base was its business with Daimler–Chrysler, General Motors, and Ford Motor Company, the so-called "tier-one" manufacturers, who sell directly to the automotive companies. Approximately fifty-percent of DCT's sales, toward the end of its business, were conducted with "tier-one" manufacturers. DCT sold original equipment to the manufacturers, known in the industry as OEM's, that actually assembled automobiles or machine components for automobiles.

Effective December 1, 1999, Van Buren and DCT, entered into a ten-year lease for approximately 345,000 square feet of industrial premises located at 6735 Haggerty Road (the "DCT Building"), Van Buren Township, in the metropolitan Detroit area (DCT Lease) (Van Buren Ex. 2). Steve Gordon (Gordon) of Signature Associates, a large commercial and industrial real estate broker in the Detroit Metro area acted as the real estate broker for Van Buren and was paid a commission by Van Buren. The Debtor guaranteed DCT's obligations under the DCT Lease. The Debtor was DCT's principal officer. DCT paid a security deposit of $148,062 to the Landlord. DCT's in-house counsel, Georgette Dulworth, negotiated the terms of the DCT Lease and DCT's outside counsel also reviewed the DCT Lease prior to its execution.

Adjacent to the DCT Building is a "sister" building known as 6703 Haggerty Road (the Van Buren Building), which is substantially similar to the building leased to DCT. However, the Van Buren Building has not, as of yet, been "built-out" or improved for occupancy. Gordon was the Landlord's initial broker trying to lease the Van Buren Building. Gordon placed signs on the Landlord's property advertising that the vacant Van Buren Building was available for rent (Doc. No. 209). After DCT occupied the DCT Building there was a downturn in DCT's business, so in early 2001, DCT also retained Gordon in an attempt to find a sub-tenant for the Building. At this time, Gordon was still representing the Landlord trying to lease the adjacent Van Buren Building (Doc. No. 209).

Sometime prior to August 2001, Mazda expressed some interest in subletting the DCT Building. In fact, Gordon was acting as real-estate broker for Mazda, as well as for DCT and the Landlord. However, the negotiations did not proceed very far. As explained by David Haboian (Haboian), the Landlord's representative, Mazda had considered moving some of its business from its facility in Flat Rock, Michigan, but

these plans to partially relocate were shelved and Mazda decided to remain in its existing facility.

In the summer of 2001, the Landlord dismissed Gordon as its broker for the still vacant Van Buren Building. For a short time, until September 2001, Kojaian Management Corporation acted as broker for the Landlord. Then Grubb & Ellis became the Landlord's broker. According to the Landlord, Gordon's services were terminated for "lack of performance." However, Gordon continued to represent the interests of DCT. Gordon placed a sign on the Landlord's property to the effect that he was the broker subletting the DCT Building. According to Gordon, there were now signs on the property for both Grubb & Ellis, who was now responsible for leasing the Van Buren Building, as well as his own sign advertising the DCT Building for subletting (Doc. No. 209). However, the Landlord later removed Gordon's sign from the property.

In about July 2001, there was serious interest by an entity called Bay Logistics in leasing both the Van Buren Building and the sister DCT Building. Bay Logistics was a supplier to General Motors. However, this proposal to lease both buildings was contingent upon the Township of Van Buren making significant changes to its zoning restrictions to permit parking on the premises for an excess of 300 semi-trailers.

In August 2001, the Township refused to accommodate the Landlord and the opportunity to let both buildings to Bay Logistics was lost. The Debtor, through the testimony of Dulworth, has questioned whether the Landlord made diligent efforts to request the Township of Van Buren to alter its zoning requirements. The fact of the matter is Van Buren diligently sought to alter its zoning in light of the fact that his own building was vacant, as

was the building leased to DCT. Bryce Kelley (Kelley), who was in charge of zoning matters for the Township of Van Buren, testified that in August 2001, the Landlord and a General Motor's representative argued vigorously that the Township should grant a zoning variance to permit parking for the required trailer parking spaces. Although the Township simply refused to make the necessary changes Kelley stated, "the owners of the building were clearly extremely eager, and have been, to put tenants in the building. Because the Township refused to permit the additional parking spaces, Bay Logistics rented premises from Ashley Capital, in Brownstown, Michigan."

On February 14, 2002, DCT was subject to an involuntary Chapter 7 petition in the Bankruptcy Court for the Eastern District of Michigan. The Order of Relief was entered and Homer McClarty was appointed as DCT's Chapter 7 Trustee. Following his appointment, the Trustee obtained the keys to the DCT Building. Those keys were still in the possession of DCT's broker, Steve Gordon.

DCT paid the rent to Van Buren until February 2002. Obviously, this was in the Debtor's best financial interest as it relieved him from an immediate claim by Van Buren under his Guaranty of the DCT lease. When DCT failed to pay the March 2002 rent, Van Buren filed an action against the Debtor in State Court in Michigan based on his Guaranty. The DCT Lease with Van Buren was rejected, under the Chapter 7 case, effective April 21, 2002.

Some time after the Chapter 11 filing by DCT, when one of Henderson's business associates, Roderick Frazier, requested information from Grubb & Ellis about the DCT Building, Grubb & Ellis promptly provided him with information on the DCT Building as well as a number of other

buildings that might be of interest to Frazier. (Db.Ex. 8) There is no doubt that Van Buren, through Grubb & Ellis, was trying to lease the DCT Building and mitigate its loss.

In October 2002, in connection with a potential lease with Federal Express, the Township of Van Buren did agree to permit parking for 150 trailers. (Db.Ex. 9) However, the deal with Federal Express still did not materialize.

At the hearing, the Debtor also suggested that Bay Logistics might have had further interest in leasing the DCT Building in 2002. However, Gordon testified that he was the broker for Bay Logistics in 2002 and that Bay Logistics chose to rent premises in an old K–Mart facility owned by an unrelated landlord (Doc No. 209).

■ The Claim under challenge by the Debtor is filed in the amount of $18,410,514.73, which according to the schedule attached to the proof of claim is the remaining accrued and unpaid balance of the lease. However, the Claim makes no distinction between the contractual rent that accrued and was unpaid from February 14, 2002 (the date of DCT's filing of Chapter 7) to April 21, 2002 the day the DCT Lease was rejected by DCT, which in turn triggered rejection damages against DCT and against the Debtor based upon his status as a guarantor. Thus the claim is filed and obviously can not be allowed. The landlord of a rejected commercial lease has the right to assert three possible separate and distinct claims. These claims are as follows: (1) for rent accrued and earned but not paid up to the date of the commencement of the bankruptcy case a general unsecured claim, (2) an administrative rent claim not pursuant to the lease, but based on the reasonable value of the use and occupancy by the debtor's estate of the lease premises allowable as a claim as cost of administration pursuant to

Section 503(b) of the Code, which is entitled to first priority pursuant to Section 507(a) of the Code, and (3) rejection damages composed of the amount the landlord would have been earned if the lease was fully performed less the amount the landlord realized from re-letting the premises reduced to its present value.

However, because counsel for the Debtor failed to base his objection to the claim of Van Buren, the Court will only consider the grounds set forth in the Debtor's Objection to Claim No. 71 and the respective contention of the parties. In support of his Objection of Claim No. 71, the Debtor contends that the claim should be disallowed because (1) Van Buren failed to establish a prima facie validity of its claim, (2) Van Buren failed to mitigate its damages, (3) Van Buren is judicially estopped from making a claim in the DCT case that it makes in the case of the Debtor, and (4) Van Buren released the Debtor of his guaranty of the DCT lease of the Van Buren property.

In response to the Debtor's Objection of Claim No. 71, Van Buren contends that (1) judicial estoppel does not limit their claim against the Debtor, (2) failure to mitigate is not a defense to their claim, and (3) Section 502(b)(6) of the Code does not limit their claim.

In the present instance, it is without dispute that DCT was current on the rent until the involuntary Chapter 7 case was filed against it on February 2003. It is equally without dispute that the Van Buren lease was rejected by the DCT Trustee by operation of the law because the Trustee failed to assume the lease within the required 60 days of assumption provided for by Section 365(d)(1) of the Code. There is nothing to justify the consideration of any claim asserted against the Debtor for administrative rent if any ac-

crued between the succession of payment of the rent by the DCT Trustee until the date of rejection. Ought that appears such administrative rent claim might have been asserted against DCT in its case and satisfied. For this reason this Court will not consider any liability of the Debtor for administrative rent if any accrued between the date of the commencement of the case and date of the rejection of the lease.

It should be noted at the outset that it cannot be gain-said that while a claim filed in the proper form and which is fully documented carries a presumptive validity once the claim is challenged the ultimate burden of allowability is on the claimant. 11 U.S.C. § 502(a); FBRP 3001(f); *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 21, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000).

Considering the Debtor's objection in reverse order, this Court is satisfied that the Debtor's contention that Van Buren released the Debtor of his guaranty of the DCT lease is without merit. In support of this contention, the Debtor claims that the surrender of the DCT property to Van Buren on April 21, 2002, by the DCT Trustee released the Debtor of his guaranty of the DCT lease. It is without dispute, that the parties, who were both represented by counsel, negotiated and entered into the DCT lease at arm's length. It is further without dispute that the Debtor, who guaranteed the DCT lease, had the necessary intelligence to assess the risk of such an agreement. Given this meeting of the minds, it is clear that the Debtor is bound by the terms of DCT lease. The language of Section 33(g) of the DCT lease clearly provides that, "this Guaranty shall remain in full force and effect notwithstanding the institution by or against any Tenant of bankruptcy, reorganization...or the disaffirmance of this Lease in any such proceeding or otherwise."

Given the unambiguous language of the Guaranty clause and the undisputed facts from the record, the Debtor's surrender of the DCT property to Van Buren by the DCT Trustee has no effect on the guaranteed obligations of the Debtor.

The Debtor's next contention is that Van Buren is judicially estopped from making different claims in the DCT case and the Debtor's case must fail as it is without basis. The doctrine of judicial estoppel is equitable in nature and is invoked at the court's discretion only to prevent the perversion of the judicial process by precluding a party from "asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282 (11th Cir. 2002). Courts consider two factors in the application of judicial estoppel: (1) it must be shown that the allegedly inconsistent positions were made under oath in a prior proceeding and (2) such inconsistencies must be shown to have been calculated to make a mockery of the judicial system. *Burnes*, 291 F.3d at 1287; *Salomon Smith Barney, Inc. v. Harvey*, 260 F.3d 1302 (11th Cir.2001).

In the present case, it is without dispute that Van Buren filed a proof of claim in the amount of $18,410,514.73. It is also without dispute that in the DCT bankruptcy case Van Buren filed a proof of claim in the amount of $2,736,304.26. A cursory reading of these proofs of claims seems to present inconsistent positions sworn under oath by Van Buren. However, in applying the doctrine of judicial estoppel, a court must consider all of the circumstances and facts relevant to the intent of the party against whom the doctrine sought to be invoked. *Burnes*, 291 F.3d at 1286. Clearly, the record represents that the variance in the amounts claimed by Van

Buren is premised on their contention that the "cap" in Section 502(b)(6) of Code does not apply to their claim against the Debtor, but did apply to their claim against DCT. Therefore, it can not be conceivably reasoned that an inconsistency exists since the claims of Van Buren are based on separate distinct issues. Moreover, the proof of claim filed in the DCT case was filed against DCT and the claim presently under consideration is filed against Henderson. Furthermore, even if these proofs of claims were inconsistent, there is no evidence in the record that alludes to Van Buren intentionally attempting to make a mockery of the judicial system by filing such claims.

In sum, based on this record and the principles which govern the doctrine of judicial estoppel, this Court is satisfied that it would be inappropriate to apply the doctrine and bar Van Buren of such claim.

■ This leads to the Debtor's next contention that Van Buren failed to mitigate damages. In support of this proposition, the Debtor maintains that Van Buren never listed the DCT property at a competitive rate. Beyond question, the real estate market in Detroit for the type of premises leased to DCT is depressed. By 2001, when DCT hired Gordon to find a subtenant, the rent payable under the DCT Lease was above the then market rate. Before this Court, the Debtor complained that the Landlord somehow precluded DCT from sub-letting the DCT Building because, so the Debtor claimed, the Landlord would not let DCT sublet the premises for less than the rate established in DCT's lease. However, the evidence refutes the Debtor's assertion and the Debtor presented no testimony at all that it ever even requested the Landlord to consider a viable potential sub-tenant at any rate. Indeed, the only testimony about potential sub-tenants was related to (1)

Mazda, who independently decided not to leave its existing facility and (2) Bay Logistics, who the Landlord actively pursued and whose interest in both buildings was contingent on the rezoning by the Township.

The DCT Lease does not expressly provide that the DCT Building shall now be sublet for less than the then market rate. (Db.Ex. 1). Clearly, this was a negotiated term of the arrangement between DCT and Van Buren, as was the provision that the Landlord would not be required to re-let the DCT premises so long as comparable premises were available in the Van Buren Building. (Db.Ex. 1).

Haboian explained that the Landlord interpreted the market rental provision in the DCT Lease as referring to the rental rate at the time the tenant was attempting to sublet the premises, not to the original rental rate in the DCT Lease. Haboian then explained that the rental rate at which the adjacent building was offered was a rate "consistent with the marketplace." The Landlord has no incentive or reason to market either building at above market rates in a depressed rental market.

While the Debtor questioned whether the Landlord would have approved a sublease at below the then market rent, it was clearly established that Gordon never asked the Landlord to approve any request relating to a sub-tenant. Indeed, as Gordon made clear in a report to Henderson, it was Gordon's opinion that, "we are hindered by the inability to make aggressive lease rates (i.e. below the market rates)...because we are confined by the market rate clause which is in your existing lease." In other words, Gordon never asked for relief from the then market rate clause and the provisions of the DCT Lease itself were the "hindrance" so far as Gordon was concerned. In short, Henderson wants to rewrite the DCT

Lease and his accompanying guarantee to create a "defense" to the Landlord's legitimate claim. In addition, Dulworth, as counsel for DCT, never complained in writing or otherwise to the Landlord that the then market rate provision inhibited DCT nor did she request relief from that provision.

The Landlord's principal Michael Kojaian (Kojaian) explained that he never even had any conversation with Henderson about Mazda. In addition, Kojaian confirmed that, "nothing had ever been presented to the landlord in the way of a written proposal for our consideration for the sublease of the building, irrespective of rental rates." Kojaian also explained that the rental rates for both buildings are based on comparisons with class-A buildings and that, "we price at the market."

Accordingly, the evidence presented by Van Buren clearly demonstrated a good faith effort to mitigate damages notwithstanding both the DCT building and the sister building are still vacant. Therefore, the Debtor's argument as to failure to mitigate damages is not well taken.

■■■ The primary thrust of the Debtor's challenge of the proof of claim filed by Van Buren is based on the contention that Van Buren failed to establish a prima facie case for the allowance of their claim. In support of this contention the Debtor initially states that Van Buren failed to present any proof as to the fair market value of the "building" (sic) for the remaining 7½ years of its lease with DCT. It should be evident that what the Debtor meant was not the value of the building, but the "fair market value" of the lease for the remaining 7½ years.

It is well established that the amount of rent stipulated in the lease between the landlord is presumed to represent the reasonable value of the use and occupancy of the premises by the estate. *In re Howe*

*Products, Inc.*, 125 B.R. 313 (Bankr. M.D.Fla.1991) Although, this principle is frequently used in considering an allowance of an administrative rent claim for use or occupancy of the premises by the estate, there is no reason why it should not be equally applicable to the instant case when considering the fair market value for the rent of the period involved. It is without dispute that the DCT Lease was an arm's length transaction negotiated by sophisticated parties. The presumption is, however, rebuttable by competent evidence showing that, due to the changes in the marketplace, the amount fixed by the lease is no longer the fair market rental value.

It is true that there has been a downturn in the real estate market in Detroit for the type of premises leased to DCT. However, it is clear that the Debtor failed to present evidence that would rebut the presumption that the DCT Lease represents the fair market rental value of the DCT property. Given this lack of evidence, there is no reason why this Court should not conclude that the amount of the rent fixed by the DCT Lease is an indication of the fair market rental value for the DCT property.

For this reason the contention of the Debtor that Van Buren failed to establish the fair market value of the premises is without merit and should be rejected.

■■■ This leaves for consideration the last component of the claim, which is the amount of an unsecured claim, which could be allowed to compensate Van Buren for rejection damages. This in turn requires the determination of first, the appropriate standard for calculating rejection damages and second, whether or not the statutory cap on rejection damages that is set forth in Section 502(b)(6) of the Code is applicable to the liability of a guarantor of

a lease as distinguished from the liability of a prime obligor the lessee of the lease.

It is without dispute that the DCT Lease explicitly states that the rejection damages shall be calculated pursuant to the laws of the State of Michigan. (Db.Ex. 1). Under Michigan law, the damages the lessor was entitled to recover was the loss of the bargain, the difference between the rent agreed on and the actual rental value of the premises for the balance of the term. *Leo v. Pearce Stores Co.*, 57 F.2d 340 (E.D.Mich.1932). Or, to put the principle another way the difference between the total rent agreed on and the mitigation damages if any. It is without dispute that notwithstanding efforts on the behalf of Van Buren, the DCT property was never re-let. Given the fact that the DCT property has never been re-let, it is obvious that mitigation damages would be equal to zero. Therefore, the amount of rejection damages Van Buren is to receive should be equal to the total of the rent agreed on by the parties in the DCT Lease. Ruling otherwise would prevent Van Buren from receiving the rental price it bargained for, which in turn would allow the Debtor to receive a windfall.

This leaves for consideration the second prong, which is whether or not the statutory cap imposed on rejection damages pursuant to Section 502(b)(6) of the Code applies to a guarantor of the lease. In response to this proposition, it is the contention of Van Buren that Section 502(b)(6) of the Code does not require applying the cap to the claim against a guarantor of a tenant's obligations under a lease. Therefore, the liability of a guarantor should not be subject to the limitation of Section 502(b)(6) of the Code.

11 U.S.C. § 502(b)(6)(A) provides as follows:

> If such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease . . .

The plain language of the Section leaves no doubt that in the claim of Van Buren against DCT, the Lessee under the DCT Lease would be subject to the "cap." The question for this Court is whether the "cap" also applies to the guarantor of the rejected lease, in this instance, the Debtor.

Several courts which considered this issue answered in the affirmative. In the case of *Hippodrome Bldg. Co. v. Irving Trust Co. (In re Radio–Keith–Orpheum Corporation)*, 91 F.2d 753 (2d Cir.1937), the court considered the predecessor to 11 U.S.C. § 502(b)(6). The court construed provision 11 U.S.C. § 207 of the Bankruptcy Act of 1898 to hold that the guaranty is a secondary obligation and must be subject to the same limitations as the primary obligation. It would be a novel interpretation of a statute that is silent on this point to conclude that the obligation of the guarantor should be greater than that of the obligation of the principal obligor.

Several Bankruptcy Courts considering this issue all agreed that this same rule should apply under 11 U.S.C. § 502(b)(6). In the case of *In re Clements*, 185 B.R. 895 (Bankr.M.D.Fla.1995), the court held that although the Section is silent and does not mention guarantors, it is well established that it really applies to guarantors. *Citing In re Radio–Keith Orpheum, also citing Hippodrome Bldg. Co. v. Irving Trust Co. supra; In re Revco D.S., Inc.*, 138 B.R. 528 (Bankr.N.D.Ohio 1991); *In re Interco, Inc.*, 137 B.R. 1003 (Bankr.E.D.Mo.1992).

This Court is not unmindful that the bankruptcy court in the case of *In re Danrik, Ltd.*, 92 B.R. 964 (Bankr.N.D.Ga.

1988) held that the cap of Section 502(b)(6) does not apply to guarantors of a rejected lease. It did so based on the "special equities" of the case, which militated in favor of granting the full amount of the damages unlimited by Section 502(b)(6). In *Danrik*, the debtor/guarantor was solvent. All other claims had been paid in full and the tenant did not file for bankruptcy. This Court has no quarrel with the decision in *Danrik*, but in the present instance, the guarantor is far from being solvent. It is highly unlikely that the Debtor's creditors will be paid in full. In the case of *In re Episode USA*, 202 B.R. 691 (Bankr.S.D.N.Y.1996) the court, applying the principle of *United States v. Ron Pair Enterprises*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), held that the plain meaning of the language of the statute is conclusive that the Section neither includes nor excludes guarantors. Furthermore, it held the "cap" was designed not toward any particular debtor-equity but rather to the claim of lessors for rejection damages.

In the case of *In re McSheridan*, 184 B.R. 91 (9th Cir. BAP 1995) both the prime obligor and the guarantors were debtors in bankruptcy. The court applied the "cap" to the claim against the guarantor of the lease. *Citing In re Interco supra; In re Revco, supra; In re Federated Dep't Stores Inc.*, 131 B.R. 808 (S.D Ohio 1991); *In re Rodman*, 60 B.R. 334 (Bankr.W.D.Okla.1986). In the case of *In re Loewen Group Int'l, Inc.*, 274 B.R. 427 (Bankr.D.Del.2002); the court citing the cases cited above held that to distinguish the application of the "cap" between the prime obligor and the guarantor is not warranted where both of them are debtors seeking relief under the Code. It is apparent that the limitation is equally applicable to rejection damage claims against the prime obligor and to the guarantor of the lease.

Based on the foregoing, this Court finds that the rejection damages that may be recovered by Van Buren against the Debtor as a guarantor of the DCT Lease are limited by Section 502(b)(6) of the Code. Having concluded that the appropriate amount of rejection damages is the amount fixed by the original lease; that notwithstanding Van Buren's good faith effort to re-let the premises did discharge its duty to mitigate its damages without success. The proper amount of rejection damages allowable is the total of the amount of the fixed amount of the lease accrued between the date of rejection and the terminal date of the lease, limited by the statutory cap of Section 502(b)(6) and reduced to the present value of the award.

Accordingly it is

ORDERED, ADJUDGED AND DECREED that Debtor's Objection to Claim No. 71 Filed by Van Buren Industrial Investors is sustained in part and overruled in part. It is further

ORDERED, ADJUDGED AND DECREED that Claim No. 71 shall be allowed as a general unsecured claim in accordance with the principles set forth above. It is further

ORDERED, ADJUDGED AND DECREED the parties are directed to submit within (20) days of the entering of this Order the amount to be allowed by applying the cap of Section 502(b)(6) of the Code and reduced the same to the present value of the amount. It is further

ORDERED, ADJUDGED AND DECREED that in the event an agreement is not reached as to the amount to be allowed the matter shall be set for hearing with notice to the parties in interest and determined by the Court.