**In re CROWN BOOKS CORPORATION,**
**Debtor.**

**No. 01–407 MFW.**

United States Bankruptcy Court, D. Delaware.

March 17, 2003.

Teresa K.D. Currier, Frances Gauthier, Kathleen P. Makowski, Klett Rooney Lieber & Schorling, Wilmington, DE, David M. LeMay, Melissa A. Flannigan, Chadbourne & Parke, LLP, New York City, for Post–Effective Date Committee.

William F. Taylor, Jr., McCarter & English, LLP, Wilmington, DE, for Dollinger–La Canada.

## MEMORANDUM OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the Liquidating Supervisor's Sixth Omnibus Objection to Claims relating to lease rejection damages. Specifically, the Liquidating Supervisor objects to the claim of Dollinger–La Canada Associates ("Dollinger") for rejection damages incurred as the result of a rejected lease, asserting there was mitigation of the damages when the premises were relet.

## I. FACTUAL BACKGROUND

On January 4, 1995, Dollinger and Crown Books Corporation ("the Debtor") entered into a lease ("the Lease") for premises located at 475 Foothill Boulevard, La Canada, California. The Lease commenced on February 1, 1996, and had a termination date of February 1, 2003. On February 12, 2001, the Debtor filed for protection under chapter 11 of the Bankruptcy Code. Thereafter, the Debtor rejected the Lease and turned over possession of the premises on May 1, 2001.

Dollinger made efforts to relet the premises by removing fixtures, making improvements, and paying lease commissions. Ultimately, Dollinger entered into leases (the "Replacement Leases") with Aaron Brothers and Hans Beauty (collectively "the Replacement Tenants") for the premises, which commenced on December 28, 2001, and January 1, 2002, respectively.

Dollinger filed a proof of claim alleging Lease rejection damages totaling $469,856.13. The Liquidating Supervisor and Post–Effective Date Committee of Unsecured Creditors (collectively "the Objectors") objected to the claim since the monthly rent under the Replacement Leases ($27,333) exceeds the monthly rent due from the Debtor under the original Lease ($24,024). In addition, the Objectors contend that the brokerage commission charges and leasehold improvements ($247,683) incurred by Dollinger in connection with the Replacement Leases may not be claimed as rejection damages under the Lease.

---

**1.** This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

The hearing on the Objection was held on January 22, 2003, and the parties submitted post-hearing letter briefs on February 5, 2003.

## II. *JURISDICTION*

This Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(1), (b)(2)(A), (B) and (O).

## III. *DISCUSSION*

To determine the entitlement of Dollinger to any claim for rejection of the Lease, we must start with the terms of that Lease.[2]

In section 15.2 entitled *"REMEDIES,"* the Lease provides: "If an Event of Default occurs then Landlord [i.e. Dollinger] shall be entitled to exercise any of the following remedies provided in this Article 15 . . . . All rights, privileges and elections or remedies are cumulative and not alternative to the extent permitted by law." (Lease § 15.2.)

In the event of default, Dollinger is entitled to enter the premises, declare the Lease terminated, and "may also recover" the following:

(i) the worth at the time of award of any unpaid Rent which has been earned at the time of such termination; plus

(ii) the worth at the time of award of the amount by which the Rent for the balance of the Term after the termination of this Lease exceeds the present worth of the then current fair market rent for such spaces; plus

(iii) brokerage commissions incurred and paid by [Dollinger] as a result of the entry into this Lease, which shall be computed by multiplying said commissions by a fraction, the numerator of which shall be the number of months of the Initial Term remaining at the time of such termination, and the denominator of which shall be the number of months of the Initial Term.

(Lease § 15.2(a).)

Without declaring the Lease terminated, Dollinger also has the right to enter and relet the premises:

(d) If [Dollinger] elects to relet the Premises as provided in the proceeding [sic] paragraph, then rentals received by [Dollinger] from such reletting shall be applied as follows:

(i) to the payment of any indebtedness other than Rent due hereunder from [the Debtor] plus interest at ten percent (10%) per annum;

(ii) to the payment of all reasonable and necessary reletting expenses, provided that any brokerage commissions payable by [the Debtor] hereunder shall not exceed the brokerage commissions payable as calculated pursuant to paragraph 15.2(a)(iii);

(iii) to the payment of the costs of any alterations of [sic] any repairs to the Premises needed to return the Premises to the condition which [the Debtor] is required to return them at the end of the Term; and

(iv) to the payment of Rent due and unpaid hereunder.

---

**2.** Dollinger also asserts that it is entitled to statutory damages under California Civil Code section 1951.2, which states what a lessor may recover from a lessee upon termination of a lease. However, the statute does not contain any damages in addition to what the Lease does and the Lease does not modify Dollinger's statutory rights. Therefore, we find it unnecessary to address that argument.

(Lease § 15.2(d).) Section 15.2(d) indirectly gives rise to additional damages by providing a procedural mechanism of what items reletting proceeds shall be applied towards. In other words, by listing categories in order of application, the inference arises that damages for those categories are recoverable in the event of reletting, otherwise the list would be rendered a nullity. Accordingly, Dollinger may recover damages under section 15.2(d) of the Lease.

Since the Lease expressly provides that all remedies are cumulative, the damages under both sections 15.2(a) and (d) are recoverable. Dollinger's claim calculates rejection damages of $469,856.18 as follows: eight months of unpaid rent at $24,024 per month ($192,192); eight months of CAM charges at $1,580 per month ($12,640); eight months of insurance premiums at $438 per month ($3,504); the pro rata portion of property taxes for eight months of 2001 ($13,837.18); brokerage commissions for obtaining new tenants ($89,784); and leasehold improvements done for the new tenants ($157,899).

### A.  *Unpaid Rent*

■ The Objectors concede that Dollinger received no rent from any source during the eight months following rejection (i.e. May 1, 2001, through December 31, 2001) and that the unpaid rent, CAM and other charges under the Lease for that period total $222,173.18. The Objectors argue, however, that simply totaling the amounts due for that period is inappropriate in light of the Replacement Leases and the increased total rent received from the Replacement Tenants. We agree and

conclude that the damages must be reduced by the increased rent Dollinger will receive under the Replacement Leases for the final thirteen months of the original Lease's term. The increased rent is $3,309 per month for a total of $43,017 for the period from January 1, 2002, through February 1, 2003.[3] These additional rents mitigate the damages incurred by Dollinger from the premature termination of the Lease by the Debtor. Therefore, Dollinger's rejection damages claim should be reduced by $43,017 to $426,839.13.

### B.  *Brokerage Commissions*

■ In its claim, Dollinger asserts entitlement to brokerage commissions paid in connection with securing the Replacement Tenants. The Objectors contend, however, that the Lease expressly excludes these brokerage commissions from recoverable damages.

We agree with the Objectors. While allowing recovery of "all reasonable and necessary reletting expenses," section 15.2(d)(ii) expressly limits recovery of brokerage commissions as follows: "any brokerage commission payable by [the Debtor] hereunder shall not exceed the brokerage commissions payable as calculated pursuant to paragraph 15.2(a)(iii)." Section 15.2(a)(iii) calculates the brokerage commission as that paid by Dollinger in connection with entry into the *original Lease* (not the Replacement Leases). In this case there was no brokerage commission paid in connection with the original Lease. Therefore, section 15.2 provides that Dollinger's claim against the Debtor for brokerage commissions is capped at zero.

---

**3.**  This comparison calculation is only done for rent because the CAM charges, insurance premiums, and property taxes are borne by the lessees under the Lease and the Replacement Leases; thus, these charges do not affect the

amount of Dollinger's claim except to the extent these went unpaid from the rejection date to the commencement of the Replacement Leases.

Thus, we conclude that Dollinger's brokerage commissions ($89,784) are not recoverable from the Debtor under the Lease. Accordingly Dollinger's claim must be further reduced to $337,055.13.

### C. Leasehold Improvements

■ The Objectors further challenge Dollinger's rejection claim by asserting that the Lease does not cover costs incurred preparing the property for the Replacement Tenants. They rely on section 15.2(d)(iii), which limits Dollinger's recovery to repairs made in order "to return the Premises to the condition which [the Debtor] is required to return them at the end of the Term."

However, section 15.2(d)(ii) also entitles Dollinger to "all reasonable and necessary reletting expenses." We conclude that improvements to the premises to attract and consummate the Replacement Leases are "reasonable and necessary reletting expenses." The Objectors do not assert that the improvements undertaken by Dollinger were unreasonable or unnecessary. They were apparently required by the Replacement Tenants to induce them to sign the Replacement Leases. As a result, we conclude that the improvements (both to return the premises to their original condition and to prepare them for the Replacement Tenants) in the amount of $157,899 are recoverable damages under the Lease.

Accordingly, Dollinger's claim for rejection damages is $337,055.13.

### D. Section 502(b)(6)

■ Section 502(b)(6) of the Bankruptcy Code caps allowed rejection damages at the lesser of one year's rent or 15% of the rent due for the remainder of the Lease. In calculating the cap, rent includes:

1) The charge must (a) be designated as 'rent' or 'additional rent' in the lease; or (b) be provided as the tenant's/lessee's obligation in the lease;

2) The charge must be related to the value of the property or the lease thereon; and

3) The charge must be properly classifiable as rent because it is a fixed, regular or periodic charge.

*In re PPI Enters.*, 228 B.R. 339, 349 (Bankr.D.Del.1998); *Kuske v. McSheridan* (*In re McSheridan*), 184 B.R. 91, 99–100 (9th Cir. BAP 1995). In this case, the base rent, CAM charges, insurance premiums, and property taxes[4] are the Debtor's obligation under the Lease, are related to the value of the property, and are regular periodic charges.

Accordingly, we conclude that the cap for Dollinger's rejection claim under section 502(b)(6) is $332,584.77, which includes one year's rent at $24,024 per month ($288,288); CAM charges at $1,580 per month ($18,960); insurance premiums at $438 per month ($5,256); and property taxes ($20,080.77).[5]

Since the actual damages under the Lease are greater than the cap calculation under section 502(b)(6), Dollinger's rejec-

---

**4.** The Objectors assert that property taxes should not be included in the calculation of the cap under section 502(b)(6). We disagree, however, because we find that the Debtor's obligation to reimburse Dollinger for yearly property taxes is a charge that is the Debtor's responsibility under the Lease, is related to property value, and is a regular periodic payment. *See, e.g., In re Rose's Stores, Inc.*, 179 B.R. 789 (Bankr.E.D.N.C.1995).

Thus, in this case, property taxes are properly included in "rent reserved" under section 502(b)(6).

**5.** The proof of claim lists $13,837.18 as the amount of property taxes for the eight month period of May through December of 2001, from which the yearly figure of $20,080.77 is extrapolated.

tion damages claim is allowed as a general unsecured claim at the capped amount of $332,584.77.

## IV. CONCLUSION

For foregoing reasons, Dollinger's rejection damages claim is allowed in the capped amount of $332,584.77.