**In re Richard H. FLANIGAN and Pamela S. Flanigan, Debtors.**

**Richard H. Flanigan and Pamela S. Flanigan, Movants,**

v.

**Samalex Trust, Respondents.**

**Bankruptcy No. 06–20473JAD.**

United States Bankruptcy Court, W.D. Pennsylvania.

Aug. 27, 2007.

Donald R. Calaiaro, Pittsburgh, PA, for Debtors Richard H. and Pamela S. Flanigan.

Gary W. Short, Pittsburgh, PA, for Respondent Samalex Trust.

## MEMORANDUM OPINION

JEFFERY A. DELLER, Bankruptcy Judge.

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr.P. 7052. The matter before this Court is a Motion for Summary Judgment filed by Debtors with respect to their objection to the claim of Samalex Trust. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). Pursuant to the Motion for Summary Judgment, Debtors ask the Court to grant summary judgment and limit the claim of Samalex Trust as set forth in 11 U.S.C. § 502(b)(6). For reasons set forth more fully in this Memorandum Opinion, the Court hereby grants the Motion for Summary Judgment, sustains the objection to claim, and finds as follows, to-wit:

### I.

The facts of this case are generally not in dispute. This case was commenced by Debtors, Richard H. and Pamela S. Flanigan ("Debtors" or "the Flanigans"), filing a voluntary petition under Chapter 13 of the United States Bankruptcy Code on February 7, 2006. (Docket No. 1). The case was converted to a Chapter 11 bankruptcy on March 14, 2007. (Docket No. 91).

On or about April 26, 2006, Samalex Trust ("Samalex") filed a Proof of Claim in this case. The Proof of Claim alleges that Samalex holds an unsecured, nonpriority claim in the amount of $267,102.00, based on Debtors' personal guaranty of a lease and a related judgment that Samalex obtained in the Court of Common Pleas of Allegheny County moments before the commencement of this bankruptcy case.[1]

---

1. On February 7, 2006, a Default Judgment was entered in favor of Samalex against the Debtors for failure to file an Answer in the amount of $265,774.00. The amount consisted of past due rent ($7089.00), accelerated rent ($246,030.00), and attorneys fees ($12,655). (Docket No. 28, Exhibit "B").

The circumstances surrounding the lease agreement and the personal guaranty are not complicated. On April 29, 2003,[2] PDQ Etna, LLC ("PDQ"), a limited liability company owned by Debtors, entered into a commercial lease agreement with Mirric Realty, LLC ("Mirric"). (*See* Docket No. 28, Exh. "A"). The ten-year lease term commenced on September 1, 2003. PDQ had the option of extending the lease for an additional five years. The 1,668 square feet of space was used to operate a Quiznos sandwich shop in Etna Towne Centre located at 550 Butler Street in Etna, Pennsylvania. Debtors aver that, after entering into the lease, they made $80,000.00 of improvements to the property, including detachable fixtures. (Docket No. 28 at ¶ 6). The monthly rent due under the lease was $2,700.00 per month.[3]

In a separate agreement dated April 29, 2003,[4] the Debtors guaranteed PDQ's obligations under the lease. (Docket No. 136, Exh. "2"). PDQ paid the correct amount of rent from commencement of the lease on September 3, 2003 through August, 2004. (Docket No. 137 at p. 3). Samalex avers that from September of 2004 through September of 2005, PDQ was delinquent in a portion of the monthly rent, which resulted in accumulated underpayment of $1,807.00.[5] (*Id.*). According to Samalex, PDQ did not make payments on the lease from October 1, 2005 through February 1, 2006. (Id. at p. 4). Debtors acknowledge default in those rental payments. (*See* Docket No. 30 at ¶ 7).

On November 11, 2005,[6] Samalex sent a letter to Pamela Flanigan, a Debtor in this case and the President of PDQ, advising of the failure to pay past rent and demanding that the Flanigans, as guarantors, make prompt payment. (Docket No. 136, Exhibit "5"). In another letter from Samalex to Flanigan, similarly dated November 11, 2005, Samalex informed PDQ that it was in default under the lease and advised Ms. Flanigan that "amounts past due shall accrue interest at the rate of 18%, until such time as the past due amounts are paid." (*See id.*).

According to Debtors, extensive flood damage, a loss which was not covered by their insurance, caused the Quiznos business to fail and as a result, PDQ permanently closed the shop and the Flanigans subsequently commenced this bankruptcy case. (*See* Docket No. 123 at pp. 1–2).

As a result of default on the lease, Samalex has filed the aforementioned Proof of Claim in the amount of $267,102.00 against Debtors, as guarantors of Samalex's lease with PDQ. (Docket No. 28, Exh. "C"). Samalex alleges that the debt owed is an unsecured nonpriority claim which has

---

**2.** In its Brief in Opposition to Debtors' Motion for Summary Judgment, Samalex avers that the lease was entered into on April *24*, 2003. (Docket No. 137 at p. 3). The actual lease agreement, however, is dated April 29, 2003. (Docket No. 136, Exhibit "1").

**3.** On October 9, 2003, PDQ and Mirric executed an amendment to the lease, which apparently reduced the monthly rent payment for the first five years to $2,641.00 per month. (Docket No. 136, Exhibits "1" & "3").

**4.** In its Brief in Opposition to Debtors' Motion for Summary Judgment, Samalex avers that Debtors executed the Guaranty on May 29, 2003.

**5.** Underpayment was allegedly due to Debtors' failure to pay the common area maintenance charge and/or landlord operating costs of $139.00 per month. (Docket No. 137 at p. 13).

**6.** In its Brief in Opposition to Debtors' Motion for Summary Judgment, Samalex states that the letter from Samalex to Pamela Flanigan was dated November 11, 2007; However, the actual letter, which is attached as Exhibit "5" to Samalex's Response to Debtors' Motion for Summary Judgment reveals that the letter was indeed dated November 11, 2005.

been liquidated by way of the Default Judgment obtained by Samalex in the Allegheny County Court of Common Pleas.[7] Samalex contends that it has not received a rent payment from Debtors since the petition date and that their damages are *substantial and continuing.* (Docket No. 137 at p. 4) (emphasis in original). Debtors allege that Samalex's claim is "grossly disproportionate in amount" of damages available under Pennsylvania law, but cites no authority in support of this proposition. (Docket No. 30 at ¶ 10).

On August 22, 2006, Debtors filed an Objection to [the] Claim of Samalex and a Motion to Strike the Samalex judgment, alleging, *inter alia,* that the claim was subject to a limitation for rent claims imposed by 11 U.S.C. § 502(b)(6). (Docket Nos. 28 & 30). Debtors contend that the guaranty claim arises out of termination of the leasehold and is therefore subject to the damages cap imposed by § 502(b)(6). (*See* Docket No. 149 at p. 4). Based on the language of § 502(b)(6), Debtors assert that Samalex's claim should be limited because it "resulted from termination of a lease of real property" and the claim is "greater than fifteen percent of the original lease and greater than three years in length after repossession of the premises and filing of the bankruptcy petition." (*See* Docket No. 30 at ¶¶ 11–13). According to Debtors, because the lease contains a monthly rent obligation of $2,700.00 per month, the statutorily imposed 12–month limit on Samalex's claim is $32,400.00. (Docket No. 122 at ¶¶ 14–16). In its Answer to the Objection, Samalex argues that § 502(b)(6) does not apply to guarantors of a lessee's obligations under a lease. (Docket No. 34 at ¶¶ 3 & 6; *see also* Docket No. 137 at p. 9). Samalex further contends that § 502(b)(6) does not apply to limit damages in this case because Samalex neither accepted a surrender of the premises

nor terminated the leasehold. (*See* Docket No. 147 at p. 2).

Debtors allege that Samalex has leased the premises to another tenant in mitigation of damages for Debtors' breach. (Docket No. 28 at ¶ 11). Samalex disputes Debtors' claim that it has re-let the premises, despite its efforts to accomplish same. (*See* Docket No. 137 at p. 1 & 4; Docket No. 136 at ¶ 4 *citing* Exh. "1"). In fact, Samalex contends that, as of September 7, 2006, the date of its Answer to Debtors' Motion to Strike, the premises remained vacant. (Docket No. 35 at ¶ 3). Samalex further avers that it never obtained a Judgment for Possession against PDQ. (Docket No. 34 at ¶ 4). Samalex argues that its claim arises from PDQ's failure to honor the guaranty and not from termination of the lease. In fact, Samalex contends that the lease has not been terminated and that PDQ may resume possession at any time, even though it appears that PDQ is out of business and Samalex has been attempting to re-let the premises to other parties since the time PDQ abandoned the premises. (Docket No. 147 at pp. 1–2).

Given the above, the Court must determine in the context of a Motion for Summary Judgment whether the statutory cap on damages set forth in 11 U.S.C. § 502(b)(6) applies in this case where Debtors personally guaranteed PDQ's obligations under a lease agreement and where the lease was never technically terminated under state law because the landlord never accepted a surrender of the premises.

## II.

A motion for summary judgment shall be granted if the court determines that "there is no genuine issue of material fact

---

7. *See supra,* Footnote 1.

and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56; *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The material facts of this case as set forth in Part I of this Memorandum Opinion are not in dispute; therefore it appears to the Court that the Motion for Summary Judgment is ripe for the Court's determination.

## III.

The Bankruptcy Code contains express limitations on the amounts by which claims of landlords can be allowed in any given bankruptcy case. The statutory cap set forth in 11 U.S.C. § 502(b)(6) provides that a landlord's claim for "damages resulting from termination of a lease of real property" cannot exceed:

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of the lease, following the earlier of—

8. During a July 17, 2007 hearing held before the Court on Debtors' Motion for Summary Judgment, the parties agreed that if the Court finds that the damages cap in § 502(b)(6) is applicable, Samalex's claim should be limited to the greater of one year's rent, or 15 percent of the remaining term of the lease. Parties further agreed that 15 percent of the remaining term of the lease is greater than one year's rent.

The parties agreed to rely on the following calculations from Samalex's Brief in Opposition to Debtors' Motion for Summary Judgment, which is as follows:

1. *"Pre–Petition" Claim (2/6/2006)*—Not capped

a. October, 2005 through February, 2006 rent at $2,641/ month=        $13,205.00 (5 months = $13,205.00) (*Base rent in Amendment is* $2,224.80 plus taxes of $279/ month and maintenance charges of $139/month)

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

*See* 11 U.S.C. § 502(b)(6) (2005).

■ In the matter *sub judice,* Samalex has asserted a claim in the amount of $267,102.00. To the extent that § 502(b)(6) of the Bankruptcy Code applies, there is no dispute that its claim would be limited to $50,665.50.[8] Samalex, however, argues that § 502(b)(6) does not apply in the instant case because the claim asserted is not a direct claim under the lease. Rather, its claim arises out of a breach of a guaranty. Samalex suggests that this distinction saves itself from application of § 502(b)(6). The Court disagrees.

From the outset, the Court notes that nothing in the plain language of

b. Underpayment of Rent for September 2004–September 2005; paid $2,502/month, should have paid $2,641/ month, underpaid $139 for 13 months =        $ 1,807.00

Total Pre-petition        $15,012.00

2. *"Remaining Rent" Claim*—(Capped at 15% or one year, whichever is greater, not to exceed three years—based on "time")

Lease commenced September 1, 2003, ten year term (120) months with Tenant having a five year option (assumed not exercised)— Pre-petition—September 1, 2003 to February 1, 2006 equals 30 months; 120 month lease—30 months = 90 months remaining × 15% = 13.5 months at $2,641.00/month (for months 31–43.5) =        $35,653.50

Total Allowed Claim        **$50,665.50**

(Excluding actual attorneys fee of $2,001.56) (*See* Docket No. 137 at p. 15).

§ 502(b)(6) precludes the statute's application in instances where a lessor is asserting its claim against a guarantor of a lease obligation. *In re Arden,* 176 F.3d 1226 (9th Cir.1999); *In re Danrik, Ltd.,* 92 B.R. 964, 967 (Bankr.N.D.Ga.1988).

All that is required by the plain language of § 502(b)(6) is that the claimant constitute a "lessor" and that the claim of the lessor be a claim for "damages resulting from termination of a lease of real property." 11 U.S.C. § 502(b)(6) (2005); *In re Arden,* 176 F.3d at 1229; *In re Lindsey,* No. 96–2268, 1997 WL 705435, *3 (4th Cir. Nov. 7, 1997).

Like the plain text of the statute, the legislative intent behind the enactment of § 502(b)(6) reflects the need for a cap on landlords' damages as applied to guarantors. The legislative history reveals that § 502(b) "is designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate." *See* S.Rep. No. 95–989, 95th Cong., 2d Sess. 63 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5849. In limiting damages allowable to a landlord, Congress made direct reference to the Second Circuit Court of Appeals' decision in *Oldden v. Tonto Realty Corp.,* 143 F.2d 916 (2d Cir.1944), which, according to Congress, sets forth the history of the Code provision. *Id.* at 2d Sess. 62. The legislative history to the statute further states that by enacting the provisions of § 502(b), Congress did not intend to overrule *Oldden. Id.*

In *Oldden,* the court analyzed the appropriate limit on a landlord's claim for damages under the Bankruptcy Act of 1934, 11 U.S.C.A. § 103, and considered whether a landlord's security deposit was appropriately deducted from the provable claim or from the smaller allowable claim. *Id.* at 917–918. In addition to reaching its conclusion that the landlord had to deduct the amount of the security from the total claim allowable under the Act, the Second Circuit surveyed the background and legislative history of statutory caps on landlords' damages. *Id.* at 921. According to the court in *Oldden,* Congress did not intend the allowance of a landlord's claim in full because doing so would force other creditors to suffer disproportionately compared to any damage suffered by a non-breaching landlord. *Id.* at 920. The court observed that a landlord is not in the same position as other general creditors because, in most cases, a landlord will be "compensated up and until the date of the bankruptcy" and "he regains his original assets upon bankruptcy." *Id.*[9]

■ Recent decisions have echoed the *Oldden* court's assessment of the purpose behind a statutory cap on landlords' damages as a way to limit lease termination claims to prevent landlords from receiving a windfall over other creditors. *In re PPI Enterprises (U.S.), Inc.,* 324 F.3d 197, 207 (3d Cir.2003); *see also In re McSheridan,* 184 B.R. 91, 97 (9th Cir. BAP 1995) *citing In re Leslie Fay Companies, Inc.,* 166 B.R. 802, 808 (Bankr.S.D.N.Y.1994) (observing that § 502(b)(6) is "grounded in principles of ratable distribution;" it balances the interests of landlords against those of other creditors by preventing landlords from receiving a windfall as a result of the filing of the bankruptcy petition); *In re Atlantic Container Corp.,* 133 B.R. 980, 985 (Bankr.N.D.Ill.1991) (finding that § 502(b)(6) is designed to compensate a landlord for the loss suffered upon termination of a lease, while not permitting

---

**9.** Stated another way, the landlord can always mitigate its damages by re-taking possession of the leased premises and re-letting the space. General unsecured creditors do not have this option.

large claims for breaches of long-term leases, which would prevent other general unsecured creditors from recovering from the estate).

This Court recognizes that the facts faced by the court in *Oldden* did not involve a landlord's claim against a guarantor. Nevertheless, the court in *Oldden* made clear that it is of no consequence whether the debtor/lessee is the tenant or a third-party guarantor. According to the court, "[The] difference is insufficient to justify divergent rules as to the respective allowable claims. If the total damages are limited in the one instance, they should likewise be limited in the other instance." *Oldden*, 143 F.2d at 921.

Many courts to address this issue have employed the § 502(b)(6) cap on landlords' damages where the debtor is a guarantor. *In re Arden*, 176 F.3d at 1229 (relying on the plain meaning of § 502(b)(6) to hold that the damages cap is applicable to a guarantor in a commercial lease); *In re Lindsey*, 1997 WL 705435 at *3 (noting that the plain language of § 502(b) does not make a distinction between lessees and guarantors, but applies broadly to any claim that is "the claim of a lessor for damages resulting from the termination of a lease of real property . . ."); *In re McSheridan*, 184 B.R. at 96 ("[the] claim is equally effective against a debtor as lessee or as guarantor of the lessee . . ."); *In re Henderson*, 305 B.R. 581, 582 (Bankr. M.D.Fla.2003) *aff'd* 143 Fed.Appx. 292

(11th Cir.2005). The Court sees no reason to disregard these well reasoned opinions, especially since they are consistent with both the text and policy of § 502(b)(6) of the Bankruptcy Code.

■ Despite the plain language and legislative history of § 502(b)(6), which support a cap on a landlord's damages, Samalex further argues that the bankruptcy court's decision in *In re Danrik*, 92 B.R. 964 (Bankr.N.D.Ga.1988) enables this Court to rely on the equities of the case to permit a landlord's full claim for damages when the debtors are solvent.[10] The Court sees no reason to adopt the court's analysis in *Danrik*, which created a judicially-crafted exception to the plain language of § 502(b)(6). Case law within the Third Circuit has suggested in the § 502(b)(6) context that debtors should not be penalized for invoking relief expressly permitted by the Bankruptcy Code. *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d at 211–212 (refusing to find "cause" to dismiss a Chapter 11 case when the case was filed for the specific purpose of taking advantage of § 502(b)(6) damages cap on landlord's claims). Thus, adopting an "equitable" exception to § 502(b)(6) appears to be contrary to the text and purpose of the statute.

This Court therefore concludes that § 502(b)(6) of the Bankruptcy Code applies not only to limit landlord claims against tenants in bankruptcy, but also in

---

**10.** Samalex argues that four of the equities considered by the court in *Danrik* are relevant to this Court's § 502(b)(6) analysis. Those four considerations include:

(1) whether the debtor/guarantor is solvent;

(2) whether claims by other creditors will be paid in full;

(3) whether the lessee has actually filed bankruptcy; and

(4) whether the landlord's claim is disproportionately large in relation to the actual damage suffered.

According to Samalex, the four equities set forth by the court in *Danrik* support Samalex's entitlement to uncapped damages because: Debtors have sufficient assets to ensure payment to all creditors; the lessee under the lease, PDQ, has not filed for bankruptcy; and, Samalex's claim is not disproportionately large as compared to its actual damages (which amount to approximately $71,000.00).

instances where guarantors of such leases seek bankruptcy protection. This Court also concludes that there is no equitable exception to application of the statute in favor of guarantors.

## IV.

▋ The most troubling aspect of this case is whether the lease giving rise to Debtors' § 502(b)(6) objection has been "terminated" for purposes of § 502(b)(6).

Debtors argue that the guaranty claim at issue arises out of termination of the leasehold and is therefore subject to the damages cap imposed by § 502(b)(6). Samalex argues, however, that the lease was not terminated, but offers no evidence in support of this claim. (*See* Docket No. 147 at pp. 1–2). The record reflects that PDQ has abandoned the premises and that Samalex has been attempting to re-let the premises. (*See* Docket No. 137 at pp. 1, 4; Docket No. 136 at ¶ 4 *citing* Exh. "1"). The lease does afford Samalex the opportunity to deem the lease terminated and re-let the premises, but the record is, at best, murky on the issue of whether a state law termination has been effectuated. (*See* Docket No. 136, Exh. "1" at pp. 8–9).

Section 502(b)(6) limits a landlord's claim for "damages resulting from *termination* of a lease of real property ..." 11 U.S.C. § 506(b)(6) (2005) (emphasis added). The Court is mindful that it must define the word "termination" as it appears in § 502(b)(6). If "termination" under § 502(b)(6) is the same as "termination" under state law, the Court cannot grant the Debtors summary judgment on this issue. This Court, however, finds that "termination" under § 502(b)(6) has a slightly broader meaning than the same term of art used under state landlord-tenant law.[11]

▋ In Pennsylvania, a lease is not terminated until the lessee's eviction is complete. *In re Valentin,* 309 B.R. 715, 718 (Bankr.E.D.Pa.2004); *In re Bacon,* 212 B.R. 66, 70 (Bankr.E.D.Pa.1997); *In re Sudler,* 71 B.R. 780, 785 (Bankr.E.D.Pa. 1987). These cases define lease termination in reference to Pennsylvania District Justice Rule 518, which allows a debtor to cure a default and remain in the premises "any time before actual delivery of the real property is made in execution of the order for possession." Pa. R.C.P.M.D.J. No. 518 (2007).[12] Unless the landlord accepts a tenant's surrender of the premises, surrender does not terminate a tenant's obligations under a lease. Re-letting the premises to another tenant to mitigate damages does not constitute acceptance of surrender by the landlord. *Hirsh v. Carbon Lehigh Intermediate Unit # 21,* 65 Pa. D. & C.4th 390, 414–415 (Pa. Com.Pl.2003). Thus, if "termination" as used in § 502(b)(6) means "termination" under state law the Court cannot grant

---

11. "Termination" is not defined in the Bankruptcy Code, and various states may have different requirements as to whether a lease termination has been effected. For example, there is divergent authority among the states as to whether a landlord's re-letting of leased premises could constitute an acceptance of surrender and termination of a lease. *See e.g.,* Milton R. Friedman, *Friedman on Leases* at § 16.302 (Practicing Law Institute, 3d ed.1990).

12. Rule 518 is known as the "pay and stay" rule and provides:

At any time before actual delivery of the real property is made in execution of the order for possession, the defendant may, in a case for the recovery of possession solely because of failure to pay rent, satisfy the order for possession by paying to the executing officer the rent actually in arrears and the costs of the proceedings. The executing officer shall give the defendant a signed receipt of any such payment.

*See* Pa.R.C.P.M.D.J. No. 518 (2007).

summary judgment on this issue because PDQ was never actually evicted from the premises and nothing in the record reflects that Samalex actually accepted PDQ's surrender of the premises.

Literally defining "termination" under § 502(b)(6) to mean "termination" as defined by state law may produce absurd results in the bankruptcy context. By way of example, in the bankruptcy context where the debtor is the lessee, a lease can always be rejected without effectuating state law termination. *In re Bacon*, 212 B.R. at 69; *Westgate Village Apartments v. Sims*, 213 B.R. 641, 643 (Bankr.W.D.Pa. 1997). In bankruptcy, rejection of a lease merely renders the lease not part of the bankruptcy estate and gives rise to breach of contract claim by the lessor against the bankruptcy estate. It is this sort of bankruptcy claim (i.e., a breach of lease claim, or guaranty claims related to the same, where the leased premises are not a part of the bankruptcy estate) that is circumscribed by § 502(b)(6) of the Bankruptcy Code.

If "termination" for purposes of § 502(b)(6) of the Bankruptcy Code equated to state law termination of the lease only, landlords could always avoid the damages cap in § 502(b)(6) by simply not "terminating" the lease if and when a lease is rejected, and instead cause accelerated rent claims to swallow the assets available for distribution to creditors in any given bankruptcy. Congress surely did not intend the statute to work this way.[13] Accordingly, an exception to the plain meaning rule applies here because the "literal application of [the] statute will produce a result demonstrably at odds with the intention of its drafters."[14] *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). In this rare type of case, the intention of the drafters, rather than the strict language, will control. *In re Mr. Gatti's, Inc.*, 162 B.R. 1004, 1010 (Bankr. W.D.Tex.1994).

The court's decision in *Oldden v. Tonto Realty Corp.*, which is referenced in the legislative history of § 502(b)(6), supports the proposition that a landlord cannot hide behind the technicality of lease termination under state law in order to escape the statutory cap on landlord's claims in bankruptcy. Instead, the court in *Oldden* suggested that statutory caps are meant to

**13.** In fact, several courts have applied the damages cap in § 502(b)(6), which limits a landlord's claim for "damages resulting from termination of a lease of real property" in cases where the lease was rejected; such cases do not state that the lease was actually terminated under state law. *See e.g., In re Stonebridge Technologies, Inc.*, 430 F.3d 260, 268 (5th Cir.2005) (where lessee rejected the lease, landlord's claim for damages arising from property of debtor's estate was properly capped under § 502(b)(6)); *In re AB Liquidating Corp.*, 416 F.3d 961, 963 (9th Cir.2005) (where the lessee rejected commercial lease, the landlord's $1 million security deposit had to be deducted from its capped rather than gross damages under § 502(b)(6)); *In re Highland Superstores, Inc.*, 154 F.3d 573, 576 (6th Cir.1998) (a landlord's damages arising from debtor's lease rejection determined in accordance with terms of lease and applicable

state law, and are further limited by application of Bankruptcy Code's cap in § 502(b)(6)); *In re Crown Books Corp.*, 291 B.R. 623, 627 (Bankr.D.Del.2003) (where Chapter 11 debtor rejected the lease prior to end of lease term, lessor was entitled to unpaid rent owing from the time debtor rejected lease until lessor obtained replacement tenant, but that amount was subject to statutory cap in § 502(b)(6)).

**14.** Additional confusion regarding "termination" in § 502(b)(6) arises because the word "termination" was not found in the predecessor to § 502(b)(6)—§ 63a(9). Section 63a(9) used the word "rejection" instead. Further, another Code Section, § 365(g), provides that "rejection of an ... unexpired lease ... constitutes a breach of such ... lease" as opposed to stating that it constitutes a "termination" of the lease. *See* 11 U.S.C. § 365(g) (2005).

limit damages for breach of a lease agreement in cases where the tenant no longer uses the leased space and the landlord can re-enter and re-let the premises in mitigation of any claim that it might have. Important to the court's decision was that a landlord is in a better position than other general creditors because they are compensated up until the date of the bankruptcy petition, they regain their original asset upon the bankruptcy, and the unexpired lease term in no way benefits the assets of the bankrupt's estate. *Oldden,* 143 F.2d at 920.

The damages cap set forth in § 502(b)(6) is intended to ensure that a landlord does not receive a windfall in damages especially when the landlord has access to the premises and an opportunity to re-let the space, which is exactly what we have in the present case before the Court. In fact, courts recognize that, in practice, § 502(b)(6) acts as a "great equalizer" between the claims of lessors, who can mitigate damages and re-let, and those of other creditors who are left with little to no recourse. *See, e.g., In re Lindsey,* 1997 WL 705435 at *3–4; *In re Thompson,* 116 B.R. 610, 613 (Bankr.S.D.Ohio 1990).

This Court is persuaded by the substance over form argument advanced by the Second Circuit in *Oldden.* Here, Samalex cannot hide behind the technicality of state law termination to receive a windfall in damages. In its own papers, Samalex concedes that PDQ has neither occupied nor used the premises in over 11 months. (*See* Docket No. 35 at ¶ 3). Indeed, Samalex admits that it has reentered and is attempting to re-let the space. (*See* Docket No. 137 at p. 1 & 4; Docket No. 136 at ¶ 4 *citing* Exh. "1"). Practically speaking, the lease has come to an end and Samalex has simply not yet elected to accept PDQ's surrender as a state law termination of the lease. It is just a matter of time before

the lease is terminated on a technical basis under state law.

■ This Court holds that Congress intended for the word "termination" in § 502(b)(6) to have a slightly more broad connotation than what is used under state landlord-tenant law. Such term includes not only a technical state law termination of the lessor-lessee relationship, but also includes circumstances where there is an uncured breach of a lease coupled with an intentional abandonment of the premises to the landlord, similar to rejection under § 365 of the Bankruptcy Code when the tenant itself is in bankruptcy. This construction of the statute ensures, as made clear by legislative history to § 502(b)(6) of the Bankruptcy Code and the Second Circuit Court of Appeals decision in *Oldden,* that landlords are not placed in an even more advantageous position than they already are by virtue of being able to retain and benefit from their asset.

Consequently, the Court finds that because the underlying lease is functionally dead, Samalex's guaranty claim arises out of termination of the leasehold regardless of whether the underlying lease has been technically terminated for purposes of state law. The claim filed by Samalex is therefore subject to the damages cap imposed by § 502(b)(6) and accordingly the Court grants summary judgment in favor of Debtors on the § 502(b)(6) issue.

## V.

For all of the foregoing reasons, the Court will enter an order which grants Debtors' Motion for Summary Judgment and sustains the objection to claim.

### ORDER OF COURT

AND NOW, this 27th day of August, 2007, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT** for the reasons set forth more fully in the Memo-

randum Opinion issued contemporaneously with this Order:

1. The Motion for Summary Judgment filed by the Debtors is **GRANTED** and the Objection to the claim filed by Samalex Trust is **SUSTAINED;** and

2. Pursuant to 11 U.S.C. § 502(b)(6), the claim filed by Samalex Trust is reduced to $50,665.50.